401 P.2d 141

STATE of Arizona, Appellee,

v.

Wade Daniel GRAHAM, Appellant.

No. 1294.

Supreme Court of Arizona.
In Division.
April 22, 1965.

LOCKWOOD, Chief Justice:

Defendant (appellant) was tried on three independent charges of burglary in the first degree in a consolidated trial before a jury. The charges were set forth in three separate informations numbered and filed respectively as No. 38025 on April 7, 1961, No. 39056 on October 19, 1961, and No. 39335 on December 1, 1961, all in Maricopa County. The jury found defendant guilty in all three cases and he was sentenced to serve a term of not less than five nor more than seven years in each case, to run concurrently.

The facts and circumstances giving rise to the filing of information No. 38025, as far as they concern us here are as follows: Putnam, the operator of the "Double 'D' Tavern" located at 2808 West McDowell Road, testified that he was the owner and bartender of the "Double 'D' Tavern" and that prior to leaving his tavern at approximately 1:30 A.M. on March 9, 1961, he checked and found the tavern and vending machines in order. Upon receiving a telephone call from a member of the Citizens Police Patrol that same morning, he returned to the tavern between 3:30 and 3:45 A.M. He unlocked the door, found the vending machines had been pried open and the coin mechanisms emptied. A box of El Roi Tan cigars, cigarettes, and three six packs of Coors twelve ounce cans of beer were missing from the tavern.

Darrell F. Smith, Atty. Gen., Robert W. Pickrell, Former Atty. Gen., David M. Lurie, Former Asst. Atty. Gen., Phoenix, for appellee.

Murray Miller, Phoenix, for appellant.

Robert Henry, a police officer for the City of Phoenix, testified that on March 9, 1961, at approximately 3:30 A.M., he was traveling south on 35th Avenue, south of Thomas Road, when he observed a car come off Encanto Boulevard, approximately half a mile from the "Double 'D' Tavern". The vehicle stopped for the traffic light. The traffic light turned green, the vehicle proceeded across the street, and the officer stopped the car. The officer got out of his car and he checked the occupants of the stopped car. All of them had been drinking and in the officer's opinion they were drunk. The officer obtained the "identification" of each occupant of the car. Approximately fifty feet away was a telephone booth. He called the Identification Bureau to ascertain if any warrants were outstanding on any of the subjects. The reply was negative.

The officer then returned to the car with the "identifications" and returned them. At that time he noticed there were numerous packages of cigarettes, a six pack of beer, a box of cigars, wine, and a screw driver lying on the floor of the back seat. He walked around to the passenger side of the vehicle, opened the door, and asked the defendant, who was sitting in the right front seat of the car, where all the cigarettes and things came from. The officer reached in and opened the glove compartment. In it he found a paper bag (State's Exhibit 3) containing pennies, nickels, dimes and quarters.

The officer also testified that he continued a visual search of the vehicle. On the floor boards directly at the feet of the defendant he "found" two more screw drivers. At this point the officer testified:

"A. * * * At this time I recalled hearing two of my officers receive a call to Double D Tavern in regards to a burglary. I then went back to my police car, picked up the radio and asked the radio dispatcher to contact the unit at the scene of the burglary, ascertain what type of property was taken and to relay the information to me. Also to have a couple of other cars come by and back me up.

"The radio dispatcher immediately did this * * *.

"As I walked back to the car with the three subjects in it I observed the defendant, Wade Graham, throw a handful of coins out the right side window out into the field. I ran up to his side of the car and I asked him why he did that and his answer basically was, my mother owns a beauty shop and she has a lot of change in here and I thought that maybe you would feel that I stole the money so I didn't want it around, I wanted to throw it away. * * * *"

The officer testified on direct examination that it was after he made the call and came back that he observed the appellant throwing the coins out of the car.

On cross examination Officer Henry testified he felt the car was suspicious because:

"That particular time of the morning, with three occupants in it, coming off of a side street approximately a half mile from a burglary call.

"Q. You did receive a burglary call?

"A. I didn't receive it myself, but I heard over the car radio one of the officers assigned to me.

"Q. Was this prior to the time you observed this automobile?

"A. I would say approximately the same time."

*    *    *    *    *    *

"Q. You stated that you opened up the glove compartment at that time, or was it at a later time that you opened the glove compartment, at the time you first stopped them?

"A. No, it was after I had come back from the telephone and returned the identifications to all three of the subjects."

The facts which concern us here with respect to information No. 39056 are as follows: A barmaid at "Troc Tavern" located on Grand Avenue testified that when she closed the tavern at 1 A.M. on May 31, 1961, the doors and windows were locked and the pin ball, music and vending machines were in proper order. The janitor for the tavern testified that when he arrived and entered the premises between 5:45 and 6:00 A.M. on May 31, 1961, he discovered that the juke box, pool table and pin ball, cigarette and bowling machines had been broken into and that the rest room window was out.

Lewis Gordon Absher who gave his occupation as "Police Patrol" testified that on the 31st of May, 1961, he was patrolling the area including the "Troc Tavern". He said he saw the defendant Graham between 3:30 and 4:00 A.M. at 17th Avenue and Grand Avenue, approximately a half block from the "Troc Tavern". Officer Absher's testimony in part was as follows:

"Q. Now, calling your attention to this particular date, namely the 31st of May, I will ask you if you had occasion to see this defendant, Wade Graham?

"A. Yes, I did.

"Q. And what time approximately was that?

"A. It would be between 3:30 a. m. and 4:00 a. m.

"Q. And where did you see him?

"A. At 17th Avenue and Grand.

"Q. And approximately how far is that from the Troc Tavern?

"A. That would be in the vicinity of a half a block.

"Q. And what was he doing when you saw him?

"A. He was walking towards town on Grand Avenue on the north side of Grand, and when I saw him I turned my patrol car around, I was going northwest and as I turned around, why, he immediately proceeded to go north on 17th Avenue.

"Q. So what did you do?

"A. So I stopped him and questioned his being there at that particular hour of the day.

"Q. Did he have anything with him?

"A. Yes, he was carrying a brown paper bag."

Officer Absher identified $107.75 as money that Wade Graham, the defendant, had in his possession in half dollars, quarters, nickels and dimes. He said they were in the paper bag that the defendant was carrying, along with coin wrappers, a pair of pliers and four keys.

On cross examination Officer Absher further testified as follows:

"Q. Officer Absher, you stated that between 3:30 and 4:00 o'clock a. m. on the morning of May 31, you observed the defendant Wade Graham walking towards town on the north side of Grand Avenue, is that correct?

"A. That is correct.

"Q. And where were you at that time?

"A. I was northwest in a patrol car on Grand Avenue.

"Q. You were in the patrol car by yourself?

"A. Yes, I was."

*  *  *  *  *  *

"Q. Officer, what about the defendant did you observe that caused you to commence to apprehend him?

"A. I found it unusual that someone would be walking that time of the morning, and as in the course of patrol work you are required to approach people that might be under suspicious circumstances. And that is the primary reason I stopped and talked to him."

*  *  *  *  *  *

"Q. Well, Officer, at the time that you observed the defendant Wade Graham, did you know that a burglary had been committed at the Troc Tavern?

"A. No, I didn't."

*  *  *  *  *  *

"Q. When you referred to the defendant, you stated he was carrying a bag containing money. How was he holding the bag?

"A. He was holding it in his left hand, as I recall, which would be on the extreme side where it would be difficult for me to see.

"Q. Was he holding it behind him?

"A. He was carrying it like you would ordinarily carry a brown paper bag.

"Q. Was he carrying it down by his side? I don't know how you would carry a bag like that, Officer.

"A. To be frank, my impression was that he was carrying his lunch."

Defendant was taken to the police station and it was at that time that Officer Absher first found out that the "Troc Tavern" had been burglarized. The following was Officer Absher's testimony:

"A. I was just checking the booking slip when the telephone rang right next to me and it happened to be Officer Dedmon, and he informed me that the bar had been burglarized, and that is how soon I found out, which would have been about my getting-off time of 6:00 a. m. or thereabouts. I believe it was 5:30, to be exact."

Information No. 39335 involved the following facts: The owner-operator of the "Copper King Tavern" located at 1835 Grand Avenue testified that when he closed the bar at 1:00 A.M. on the morning of November 21, 1961 the juke box, bowling machine, pool table, pin ball machines and a cigarette machine were all intact. The owner left the tavern at 1:20 A.M. Between 2:00 A.M. and 2:35 A.M. he was called by a police officer and told that the bar had been broken into.

The police officer, Tarantino, testified that at approximately 1:50 A.M. on November 21, 1961, he went to the "Copper King Tavern" in response to a call on the police radio. He saw someone going down behind the bar. He kicked open the door, ran inside, and announced that he was a police officer and called for the person to come out. The officer jumped on and struggled with a man for approximately five minutes. The man turned out to be the defendant Graham. The officer testified that he found $63.40 in nickels and other objects such as screw drivers in various parts of the tavern.

The defendant introduced testimony to the effect that he at times acted unnaturally. His mother testified that the defendant was not normal at birth and suffered from convulsions which continued as he grew up. She had taken him to doctors for treatment. The defendant was under the care of the psychiatrist during the year of 1961, during which time he was referred to the State Mental Hospital where he remained for four or five months.

Dr. Breitner testified that defendant was suffering from epilepsy, and was subject to spells, during which he didn't know right from wrong.

The State called Drs. Thomas Richard Gregory and William B. McGrath, psychiatrists practicing in Maricopa County, Arizona. These psychiatrists had examined

defendant on June 8, 1961, by direction of the Court. Dr. Gregory testified that the defendant was suffering from chronic brain syndrome associated with epilepsy and with mental deficiency. To certain hypothetical questions based on the facts of each of the above stated alleged burglaries, Dr. Gregory answered that at the time of the alleged burglary, it was his opinion that defendant could distinguish between right and wrong.

Dr. McGrath was also asked a set of hypothetical questions setting up the alleged burglaries. In answer to each Dr. McGrath stated that the defendant was able to understand the difference between right and wrong on the particular date.

The defendant's only claim is that the court erred in admitting into evidence that matter which was obtained illegally in the searches without warrants by the police officers since there was no showing at the trial that the police officers had probable cause to believe that a crime or crimes had been committed at the time of the search or seizure, or that the defendant had committed them.

The State does not contest the claim that there was an illegal search and seizure but only contends that the defendant did not move before trial to suppress any illegally obtained evidence or make any objection to the State's introduction of such evidence on the ground of illegal search and seizure or unlawful arrest and thus may not raise the question on appeal.

█ Recently in State v. Kananen, Ariz., 399 P.2d 426 (February 25, 1965) this Court stated that the decisions of the United States Supreme Court must be followed in regard to admissibility of evidence involving such a federal question as the obtaining of evidence in violation of rights guaranteed by the Fourth Amendment of the United States Constitution. In that decision we cited and quoted from Henry v. State of Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408, (January 18, 1965) as follows:

"We vacate the judgment of conviction and remand for a hearing on the question whether the petitioner is to be deemed to have knowingly waived decision of his federal claim when timely objection was not made to the admission of the illegally seized evidence."

Indeed in Beck v. State of Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142, the United States Supreme Court held that:

"When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543. If the court is not informed of the facts upon which the arresting

officers acted, it cannot properly discharge that function."

However, at no time during the course of this trial did the defendant make any objections based on an allegal arrest or unlawful search and seizure.

In Henry v. State of Mississippi, supra, we note that the United States Supreme Court was dealing with the question of a "timely objection". It was not dealing with a situation in which the Court was not informed at any time during the trial that the defendant contended that there was evidence which was the product of an illegal search and seizure. There the petitioner failed to comply with the Mississippi requirement that objection to illegal evidence be made at the moment it is introduced. The Court in its opinion pointed out that the petitioner, at least raised the issue at the close of the State's case when the petitioner moved for a directed verdict "assigning as one ground the use of illegally obtained evidence; * * *."

The United States Supreme Court also said:

"* * * a litigant's procedural defaults in state proceedings do not prevent vindication of his federal rights unless the State's insistence on compliance with its procedural rule serves a legitimate state interest.

* * * * * *

"The Mississippi rule requiring contemporaneous objection to the introduction of illegal evidence clearly does serve a legitimate state interest. By immediately apprising the trial judge of the objection, counsel gives the court the opportunity to conduct the trial without using the tainted evidence. If the objection is well taken the fruits of the illegal search may be excluded from jury consideration, and a reversal and new trial avoided. But on the record before us it appears that this purpose of the contemporaneous-objection rule may have been substantially served by petitioner's motion at the close of the State's evidence asking for a directed verdict because of the erroneous admission of the officer's testimony. For at this stage the trial judge could have called for elaboration of the search and seizure argument and, if persuaded, could have stricken the tainted testimony or have taken other appropriate corrective action. * * * In these circumstances, the delay until the close of the State's case in presenting the objection cannot be said to have frustrated the State's interest in avoiding delay and waste of time in the disposition of the case."

It is against this background that the United States Supreme Court remanded the case for a hearing on the question of wheth-

er the petitioner was deemed to have knowingly waived decision of his federal claim.

We have here an entirely different situation. At no time during the trial below was an objection based on the Fourth and Fourteenth Amendment raised. There was no motion for a directed verdict or acquittal based on allegedly illegally seized evidence. At no time was the trial court aided by the defense in conducting a trial without using "the tainted evidence."

It may be that the United States Supreme Court by its decision in Henry v. State of Mississippi, supra, has varied the following rule we enunciated in State v. Kemp, 95 Ariz. 60, 386 P.2d 657 (1963):

"Even assuming the evidence was illegally obtained, as a matter of law and procedure, the failure to object to its admissibility at the time it is presented by the prosecution constitutes a waiver on the part of the defendant. Indeed, the fact that the defense motions for suppressing evidence and quashing affidavits or warrants have been overruled by the court does not relieve the accused or his counsel from the duty of objecting to the admission of such evidence on the grounds that it was illegally obtained."

██ However, there is nothing in the decision in Henry v. State of Mississippi, supra, which relieves the defense of the duty of serving the "legitimate state interest" of giving "the Court the opportunity to conduct the trial without using the tainted evidence" at some time prior to the conclusion of the trial. Judges are neither omniscient nor all-knowing at all times for all purposes. It is the duty of the defense to aid the Court by raising important state and federal claims.

██ It may be that the use of allegedly illegally acquired evidence was not pointed out to the court below for some tactical reason on the part of the defense in hope, perhaps "to invite error and lay the foundation for a subsequent reversal" (Henry v. State of Mississippi, supra,) or because of "counsel's deliberate choice of the strategy". Such reasons amount "to a waiver binding on petitioner and would preclude him from a decision on the merits of his federal claim" under the Fourth and Fourteenth Amendments of the United States Constitution.

██ As we have recently said:

"The trial court must be given the opportunity to correct asserted errors before an appellate court will listen to a plea that injustice has been perpetrated." State v. Hernandez, 96 Ariz. 28, 391 P.2d 586; See also State v. Cumbo, 96 Ariz. 385, 396 P.2d 11.

Judgment affirmed.

STRUCKMEYER, V. C. J., and UDALL, J., concurring.