424 P.2d 810

**The STATE of Arizona, Appellee,**

**v.**

**Wilfred Raymond PEDERSON and Gary L. Langseth, Appellants.**

**No. 1666.**

Supreme Court of Arizona.

In Division.

March 9, 1967.

Rehearing Denied April 4, 1967.

Darrell F. Smith, Atty. Gen., Gary K. Nelson, Asst. Atty. Gen., and Robt. K. Corbin, County Atty., Maricopa County, for appellee.

Langerman, Begam & Lewis, Phoenix, Allen H. Aaron, Minneapolis, Minn., and Robert D. Myers, Phoenix, for appellants.

UDALL, Justice.

At an undetermined hour on March 14th or 15th, 1965, a SupeRx drug store in the city of Phoenix was burglarized. On March 16th at approximately 12:15 p. m. the defendant, Gary Langseth, was arrested in a Las Vegas, Nevada hotel room. The arresting officers, detectives Conger and Ruble, of the Clark County Sheriff's Office in Las Vegas, arrested Langseth without a warrant, and during the course of an immediately subsequent search of Langseth's baggage the officers found money and drugs thought to be traceable to the burglarized drug store. At approximately 1:45 p. m., the defendant, William Pederson, was arrested after he used a key to enter the room where Langseth had been found. Pederson was searched and the officers removed approximately $1031.-00 from his wallet.

After the arrest and search of the defendants, and after obtaining a search warrant, detective Conger and other officers searched Langseth's 1964 Pontiac automobile. In the car the officers found a sledge hammer, an ax, crowbars, hammers and other tools, all of which were alleged by the prosecution to be burglary tools.

Both Langseth and Pederson were returned to Arizona and after a jury trial in superior court they were found guilty of committing burglary, in violation of A.R.S. § 13–303. Each defendant was sentenced to imprisonment for a period from ten years to life. From the conviction and sentence the defendants bring this appeal.

On this appeal counsel for the defendants has raised several questions as a basis for reversal of the conviction. The principal question, which pertains to both defendants, relates to the admissibility in evidence of the money, drugs and tools which were seized after the arrests. Defendants contend there was no probable cause for their arrest without a warrant, and consequently, that the introduction of the items into evidence violated their federal and state constitutional guaranties against illegal searches and seizures. Defendants' motion to suppress was denied.

█ If the money and drugs were obtained during the course of or as the result of an illegal search and seizure, they were not admissible as evidence against the defendants. Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726. We are bound to follow the United States Supreme Court decisions which have established the guidelines for ascertaining the admissibility of evidence allegedly searched and seized in violation of rights guaranteed by the Fourth Amendment of the United States Constitution. State v. Graham, 97 Ariz. 408, 401 P.2d 141.

█ In judging the admissibility of the evidence in this case, we are guided by the following principle enunciated in Ker:

"The evidence at issue, in order to be admissible, must be the product of a search incident to a lawful arrest, since the officers had no search warrant. The lawfulness of arrest without warrant, in turn, must be based upon probable cause, which exists 'where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are]

sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.'" 374 U.S. 23, 34–35, 83 S.Ct. 1623, 1630.

With the above standard in mind, we have examined the record in order to determine whether the facts and circumstances, as they existed at the time of the warrantless arrests, were sufficient to constitute probable cause. In order to answer this issue we must first note a few additional facts, as established by the testimony.

On Sunday, March 16, Sergeant Judd of the Phoenix Police Department called the Clark County Sheriff's office in Las Vegas. The office had also received a call from agent Kensinger of the local office of the FBI in Las Vegas. Although the record indicates relatively little about the details of the telephone calls, it is clear that the subject of both was the Phoenix burglary and the defendants Langseth and Pederson.

After the calls were received Sergeant Simmons, of the Sheriff's office, talked with detective Conger, who testified as follows concerning the conversation:

"Q Did he tell you to find Mr. Langseth and arrest him?

"A He told me the information that was given to him by Detective Sgt. Judd and Kensinger.

"Q Well, the question I asked is, did he tell you to go and make an arrest?

"A Yes, sir.

* * * * * *

"Q Sgt. Simmons told you to go make an arrest?

"A I don't recall exactly if that was his words. I believe he told me to attempt to locate them. We didn't know for a fact that they were in Las Vegas.

* * * * * *

"Q And did you know that when Sgt. Judd of Phoenix called Sgt. Simmons that he did not even ask Sgt. Simmons to arrest either Langseth or Pederson? Did you know that as of March 16, 1965?

"A No, I don't know the entire text of his conversation.

"Q Do you know that to be the fact now?

"A No, sir, I still don't.

"Q So right now you don't know whether Sgt. Simmons was requested by Phoenix authorities to even make an arrest, is that right?

"A He told me that they were wanted. Sgt. Simmons said that Sgt. Judd advised him that they were wanted in Phoenix. I don't know his exact words, but they were wanted in Phoenix for burglary.

\* \* \* \* \* \*

"Q And he either told you or you interpreted that as a request to make an arrest, is that right?

"A Yes, sir."

After talking with his superior officer, detective Conger went out to look for the suspects, and during the search, over his car radio he received a message from the Las Vegas FBI office, informing him that the suspects' automobile had been located at the Dunes Hotel in Las Vegas. Detectives Conger and Ruble went to the hotel, where they met FBI agent Kensinger. During the trial of this case, in order to rule on the defendants' renewed motion to suppress, detective Conger was examined in the chambers of the trial judge, and he testified as follows, with regard to what agent Kensinger told him at the Dunes Hotel before the arrests:

"Q Now, at the time you made the arrests what facts were within your knowledge concerning the SupeRx burglary in Phoenix and the connection of these defendants with that burglary?

\* \* \* \* \* \*

"THE WITNESS: On arriving at the Dunes hotel at approximately noon, I contacted our local FBI agent, Kensinger, and he advised me at that time that a burglary had been committed in Phoenix, Arizona.

"Q Did he tell you where?

"A Yes, he said it was at the SupeRx drug store, and that the safe had been burglarized.

"He advised me that a vehicle that was answering the description of the one the two suspects are driving had been observed behind the building that the subjects were registered into [in Phoenix, Arizona], the Kon Tiki Motel, Phoenix, and that after they had left the Kon Tiki a cardboard container which appeared to be one that had been taken in the burglary was found in the room.

He also advised me that their office had received information that subjects Langseth and Pederson were traveling from Minnesota to Phoenix, Arizona for the purposes of, as he referred to, making a score, and then on to Las Vegas.

\* \* \* \* \* \*

"THE WITNESS: Now, he also had a picture of Langseth that had been forwarded to him, apparently by the FBI in the State of Minnesota.

Also, he stated that the vehicle that answered the description of theirs that was observed behind the scene of the burglary did not have a Minnesota license plate on it.

"Q Did he say anything about anything else being behind the scene [of the burglary]?

\* \* \* \* \* \*

"THE WITNESS: Well, he advised me that a witness had been observed, a subject, behind the building. I guess it was prior to the burglary. And that it answered Langseth's description. I don't know if he said it was him, but I believe he said it answered his description.

And also that shortly after the time that the burglary had occurred, that the two subjects in question had checked out of the [Phoenix] motel room where the article was found that had apparently come from the burglary.

"Q Did he say anything about Langseth's reputation in Minnesota?

\* \* \* \* \* \*

"THE WITNESS: He advised me that Langseth did have a reputation with the police officers in that area, and also the FBI.

"Q As what?

"A Of being a burglar, and that he traveled extensively, and I believe that was the extent of it. I don't recall if he specified that he specialized in safes or not.

\* \* \* \* \* \*

Do you remember anything else?

\* \* \* \* \* \*

"A He advised me that he had received this information from their agency here in Phoenix, Arizona, which had been forwarded to him, and subsequently to myself. We had also received information from Sgt. Judd, which of course I didn't receive myself—I got it from my superior—which was basically —Well, prior to that time I hadn't got too many of the details from my office

\* \* \*."

During the course of the above testimony in the chambers of the trial judge, defendant repeatedly raised a hearsay objection. We need not dwell upon this point. It is sufficient simply to note that in a hearing to determine whether probable cause existed for an arrest, what the arresting officer has been told by another person is not excludable by raising the objection of hearsay. In Draper v. United States, 358 U.S. 307, 311, 312, 79 S.Ct. 329, 332, 3 L.Ed.2d 327, 331, the Supreme Court of the United States explained the unavailability of the hearsay objection as follows:

"\* \* \* (We) find the petitioner entirely in error. Brinegar v. United States, 338 U.S. 160, 172–173, 69 S.Ct. 1302, 1309, 93 L.Ed. 1879, 1888, 1889, has settled the question the other way. There, in a similar situation, the convict contended 'that the factors relating to inadmissibility of the evidence [for] *purposes of proving guilt at the trial,* deprive[d] the evidence as a whole of sufficiency to show probable cause for the search \* \* \*.' Id. 338 U.S. at 172, 69 S.Ct. at 1309. (Emphasis added.) But this Court, rejecting that contention, said: '[T]he so-called distinction places a wholly unwarranted emphasis upon the criterion of admissibility in evidence, to prove the accused's guilt, of the facts relied upon to show probable cause. That emphasis, we think, goes much too far in confusing and disregarding the difference between what is required to prove guilt in a criminal case and what is required to show probable cause for arrest or search. It approaches requiring (if it does not in practical effect require) proof sufficient to establish guilt in order to substantiate the existence of probable cause. There is a large difference between the two things to be proved [guilt and probable cause], as well as between the tribunals which determine them, and therefore a like difference in the quanta and modes of proof required to establish them.' 338 U.S., at pages 172–173, 69 S.Ct. at 1309."

Defendants contend that the facts of this case, especially the source of the information possessed by detective Conger, bring it within the principles which controlled the decision of the United States Supreme Court in Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723. In *Aguilar,* the United States Supreme Court held that the following affidavit, submitted by police officers to a magistrate for the purpose of obtaining a search warrant, did not provide a sufficient basis for a finding of probable cause:

"Affiants have received reliable information from a credible person and do believe that heroin, marijuana, barbiturates and other narcotics and narcotic paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law." 378 U.S. 109, 84 S.Ct. 1511, 12 L.Ed.2d 725.

We cannot view the Aguilar decision as controlling in this case, in which the arrest-

ing officers had received extensively detailed information from two independent and highly reliable sources. The case of Draper v. United States, supra, decided by the United States Supreme Court in 1959, is of far greater significance to the precise issue raised on this appeal than is the Aguilar decision.

In *Draper*, a federal narcotics agent was informed by a reliable paid informer that the defendant was selling narcotics to addicts in Denver and that the suspect would return from Chicago to Denver, bringing back a quantity of heroin. The informer gave a detailed description of the defendant, and the agent arrested him on sight, without a warrant, at the train station in Denver. On the question of whether there was probable cause for the arrest, the Supreme Court stated:

> "The information given to narcotic agent Marsh by 'special employee' Hereford may have been hearsay to Marsh, but coming from one employed for that purpose and whose information had always been found accurate and reliable, it is clear that Marsh would have been derelict in his duties had he not pursued it." 358 U.S. 312, 313, 79 S.Ct. 333, 3 L.Ed.2d 332.

The Court went on to state that when agent Marsh saw the defendant, exactly as he had been described by the informer, he was able to personally verify the information, and thus had reasonable grounds to believe that the defendant would be in possession of heroin.

In view of the Draper opinion, we are convinced that a finding of probable cause in this case is not precluded by the fact that the knowledge which the arresting officers possessed came to them from other persons. Certainly, the detailed information received first-hand from two separate law enforcement agencies is not to be considered less reliable, under the circumstances of this case, than was the information supplied by a single, paid informer in the Draper case. We are not aware of any constitutional principle which

requires an arresting officer to personally verify every bit of information which he possesses, in order to have probable cause for a warrantless arrest. In many, if not most cases, personal verification would be impossible.

Notwithstanding the foregoing observations, before determining whether there was probable cause for an arrest without a warrant, we must consider the final, principal grounds urged by defendants in their argument that probable cause did not exist. Defendants contend that the arrests were made as the result of a mistake or accident on the part of detective Conger, and that there is no legitimate place, within the concept of probable cause, for an arrest made by mistake or accident.

It will be recalled, from the trial testimony of detective Conger quoted earlier in this opinion, that he could not definitely say that his superior, Sergeant Simmons, had told him to arrest the defendants. He was either told to arrest, or he so construed the instructions to locate the suspects. Detective Conger also testified that he would not have made an arrest if he had known that Arizona authorities had merely requested that the suspects be located or observed. Although such an instruction was given to local units over the Phoenix police radio frequency, there is nothing in the record which indicates that Las Vegas authorities were requested *not* to make an arrest. On the other hand, it seems also that Las Vegas was *not* specifically requested to make an arrest. During the trial detective Conger further testified that the arrest was based in part upon the belief that Arizona had requested or wanted an arrest made. He stated:

> "Had I known that Arizona had not requested they be arrested, I would not have arrested them."

On the basis of the circumstances indicated above, defendants contend, in effect, that since a request for arrest had not been made, and since an arrest would not have been effected but for the mistaken belief that a request had been made, then

obviously the arrest was not made on the basis of probable cause, but rather, on the basis of a mistaken communication between the officers involved. Defendants urge us to adopt the view that probable cause for a warrantless arrest cannot exist under such circumstances. The following statement, made in defendants' appeal brief, concisely demonstrates the reasoning behind their conclusion:

"Thus, even if a magistrate has acted, appellate courts reserve the right to make sure that he has acted in a judicial manner and has not served merely as a 'rubber stamp for the police'—Aguilar v. [State of] Texas, supra, 378 U.S. 108, 111, [84 S.Ct. 1509] 12 L.Ed.2d 723, 727. It certainly follows that an accidental arrest, which is the product of a mistake and misunderstanding, can be afforded no more dignity or standing as a basis for a search than an arrest made pursuant to a warrant uncritically and improperly issued."

■ We cannot agree with defendants' conclusion. The existence of probable cause is determined by application of an objective rather than a subjective standard. Beck v. State of Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142. Probable cause exists " ' * * * where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.' " Ker v. State of California, 374 U.S. 35, 83 S.Ct. 1630, 10 L.Ed.2d 726. We must emphasize that the test for probable cause *is not* whether a man of reasonable caution would believe that some one had requested an arrest be made; it is, whether such a man would believe that an offense is being or had been committed. In this case, all the facts and circumstances which were within the knowledge of the arresting officers, by way of independent and highly reliable sources, were sufficient, *in themselves,* to warrant a man of reasonable caution in

the belief that an offense had been committed and that the defendants had committed it. If subjective good faith of arresting officers is not, of itself, sufficient to establish probable cause, Beck v. State of Ohio, supra, we do not see how subjective mistake as to a communication can destroy probable cause where, *upon an application of the objective standard, it is found to exist.*

Notwithstanding the contention of defendants to the contrary, depending upon the facts of a given situation, there is at least limited room, within the concept of probable cause, for the subjective error. The United States Supreme Court expressly recognized this fact when it stated, in Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, 1891:

"Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."

■ In view of the foregoing, we find that the trial court was correct in its ruling that probable cause existed for the arrest of the defendants without a warrant, and consequently the items obtained as the result of the subsequent searches were not obtained in violation of federal or state constitutional provisions against illegal searches and seizures and were admissible in evidence. We will now turn our consideration to other nonconstitutional grounds urged by the defendants as bases for reversing the convictions.

■ Defendants contend that mere possession of recently stolen property, standing alone, is not sufficient to convict the possessor of a burglary involving the theft thereof. We agree that such is a correct statement of the law and we note that the trial court correctly instructed the jury concerning such:

"If you should find from the evidence that a burglary was committed on the

premises involved in this case, and that thereafter the defendants were found in possession of properties stolen from the burglarized premises, such a fact would be a circumstance tending, in some degree to show guilt, although not sufficient standing alone and unsupported by other evidence to warrant you finding them guilty.

"In addition to proof of possession of such property, there must be proof of corroborating circumstances tending, of themselves, to establish guilt."

Defendant Langseth argues from the above that there was insufficient evidence against him to supplement evidence of his possession of recently stolen property to warrant submission of the case to the jury. Langseth relies on a decision handed down in 1918, People v. Nichols, 39 Cal.App. 29, 177 P. 861, which has language to the effect that the evidence in supplement of a showing of possession must be strong and significant, because possession is not to be given undue weight.

 A more recent case from the same jurisdiction has been brought to our attention, however, which we believe more correctly states the applicable law. In People v. Alexander, 78 Cal.App.2d 954, 178 P.2d 813, at page 815, the court said:

"While such possession would not, standing alone, suffice to determine the possessor's guilt, yet as evidence, its quality is of such high degree that only slight corroborative proof of other inculpatory circumstances would warrant a conviction." See also, State v. Jackson, 101 Ariz. 399, 420 P.2d 270.

The corroborative evidence in the instant case was that a witness positively identified Langseth as the man he saw "looking around" in the parking lot in the rear of the burglarized drug store approximately 40 hours prior to the crime. The witness also testified that Langseth was driving an automobile bearing Minnesota license plates. In addition, there was evidence that Langseth had been registered in a Phoenix motel at the time the burglary was committed and that a cardboard box of a type similar to one reported as missing from the burglarized store was found in the motel room vacated by Langseth and defendant Pederson. Finally, a search of Langseth's automobile by Las Vegas police officers revealed numerous tools and appliances of a type commonly used by professional safe burglars.

 We are of the opinion that the evidence referred to above amounts to more than the "slight corroborative proof of other inculpatory circumstances" necessary to sustain a conviction of Langseth when there also was evidence of his possession of recently stolen property.

 Defendant Pederson claims that notwithstanding the sufficiency of the evidence as to Langseth, there was insufficient evidence to demonstrate that Pederson was ever in possession of recently stolen property and that there was no additional probative evidence to substantiate his guilt.

It is evident from the record that the trial court denied Pederson's motion for a directed verdict and instructed the jury on the subject of joint possession of stolen property because of the fact there was testimony that Pederson admitted himself into the Las Vegas hotel room with a key. The trial court informed the jury pursuant to defendant's requested instruction that Pederson was not chargeable with possession of any articles found on Langseth's person or in Langseth's automobile but, as to articles found in the hotel room, the court gave the following instruction:

"Within the meaning of the law two or more persons may have joint possession of personal property when it is under their dominion and control, and is either in their presence and custody, or if not in their presence, the possession thereof is immediate, accessible, and exclusive to them."

Pederson contends the trial court erred in giving the above instruction because the fact of admitting oneself into a room with

a key does not establish possession, constructive or otherwise, of any objects in that room. We do not agree under the particular facts of the case at bar, for the record clearly reveals that Langseth and Pederson were traveling together, that they in fact were registered together in a Phoenix motel at or around the time of the burglary, and that they left Phoenix and drove together in Langseth's automobile to Las Vegas. Approximately one hour after the police officers arrested Langseth in Room 2122 of the Dunes Hotel, Pederson admitted himself to that same hotel room without knocking and by using his own key. When the continuing nature of defendants' relationship is considered along with the manner in which Pederson entered the hotel room, we are convinced that Pederson demonstrated access to and control of the contents of that hotel room and that the stolen property within that room was thus within the exclusive domain and control of Pederson as well as Langseth, and custody was "immediate, accessible, and exclusive to them."

The cases cited by Pederson to support his contention are not persuasive for they are distinguishable either on the ground that there was an inability to establish exclusive possession in one defendant of stolen goods found in a place accessible to others or on the ground that there was some explanation of the possession.

 Defendants' last contention is that the trial court erred in giving the following instruction:

"The burden is on one who is found in the possession of property that was stolen from burglarized premises to explain such possession in order to remove the effect of that fact as a circumstance to be considered with all other evidence pointing to his guilt."

Defendants argue that the practical effect of the above instruction was to shift a "burden of proof, of sorts, to the defendants", thus violating the well established rule that at all times the prosecution has the burden of proving beyond a reasonable doubt each essential element of a crime charged.

This Court has long held that possession of stolen goods, if unexplained, is a circumstance from which the jury might infer the guilt of a defendant, but that this circumstance, standing alone, is insufficient to sustain a conviction. Porris v. State, 30 Ariz. 442, 247 P. 1101; Allen v. State, 26 Ariz. 317, 225 P. 332. As we read the subject instruction, it appears to state the law correctly for in effect the instruction says that if defendants had wished to remove the effect of possession of stolen goods from the facts and circumstances to be considered by the jury, defendants should have offered some explanation of their possession of such goods. See, State v. Jackson, supra.

We do not think the instruction had the effect of shifting the burden of proof or in any way misled the jury. Such is particularly apparent when the subject instruction is read in conjunction with other instructions the lower court gave the jury. The record discloses that the court made it quite clear that the State had the burden of satisfying the jury beyond a reasonable doubt as to the truth of every material allegation of the information. The court further instructed the jury that the law raises no presumption against the defendants, but that all presumptions are in favor of their innocence; and, that possession of stolen goods was a circumstance tending to show guilt, but that such was insufficient to sustain a conviction in the absence of corroborating evidence.

Defendants' reliance on the case of State v. Holbrook, 223 N.C. 622, 27 S.E.2d 725, to support their argument is unwarranted. That case concerned an instruction which informed the jury that possession of stolen goods raised a presumption of guilt on the part of the defendant which must be rebutted by him; no such situation existed in the instant case.

For the foregoing reasons, the judgment of the court below is affirmed.

BERNSTEIN, C. J., and STRUCKMEYER, J., concur.