599 P.2d 187

**STATE of Arizona, Appellee,**

v.

**Joseph Clarence SMITH, Jr., Appellant.**

No. 4021.

Supreme Court of Arizona,
In Banc.

July 13, 1979.

Rehearing Denied Sept. 6, 1979.

Robert K. Corbin, Atty. Gen., John A. LaSota, Jr., Former Atty. Gen., William J. Schafer, III, Chief Counsel, Crim. Div., Lynn Hamilton, Assistant Attys. Gen., Phoenix, for appellee.

Stephen M. R. Rempe, David W. Basham, Phoenix, for appellant.

GORDON, Justice:

Defendant Joseph Clarence Smith appeals his convictions and sentences for two counts of first degree murder. Having jurisdiction pursuant to A.R.S. § 13–4031, we affirm the decisions of the Superior Court.

Early in 1976, the nude bodies of Sandy Spencer and Neva Lee were found in the desert at two different times and locations. Within less than one month, both teenage girls had been killed by asphyxiation, dirt having been forced into their mouths, which were then taped closed. Both had received stab and puncture wounds inflicted upon various parts of their bodies before and after death.

On November 4, 1976, defendant was indicted for the murders of Sandy Spencer, Count I, and Neva Lee, Count II. The counts were severed, and after extensive pre-trial motions, defendant was tried by jury and convicted of Count II, the murder of Neva Lee. Shortly after trial began on Count I, defendant changed his position and pled guilty to the murder of Sandy Spencer. After denial of his motion to have his guilty plea set aside, defendant was sentenced to the gas chamber on each count.

On appeal, defendant raises twelve issues for this Court's review:

1. Should the County Attorney's office have been disqualified from prosecuting the case, because one of its attorneys was with the Public Defender's office when that office represented defendant in another case?

2. Was there a factual basis, in compliance with 17 A.R.S. Rules of Criminal Procedure, rule 17.3, for defendant's guilty plea to Count I?

3. Did the trial court abuse its discretion in refusing to grant a change of venue because of pre-trial publicity?

4. Did the trial court err in denying defendant's motion for the appointment of an expert public opinion researcher?

5. Did the trial court err in refusing to appoint a jury selection expert to assist defense counsel?

6. Was the jury panel improperly questioned and, therefore, was defendant deprived of an impartial jury?

7. Did the prosecution fail to disclose prior felony convictions of a state witness in contravention of due process and 17 A.R.S., Rules of Criminal Procedure, rule 15.1?

8. Should the court have suppressed certain physical evidence seized from defendant's home, place of business and automobile?

9. Was the jury improperly polled?

10. Did the trial court err in failing to find mitigating circumstances?

11. Did the Arizona Supreme Court err in upholding the constitutionality of A.R.S. § 13–454, Arizona's death sentencing statute, after finding § 13–454 F severable from the remainder of the statute?

12. Was the defendant illegally sentenced, because the trial court sentenced him to be administered lethal gas without mention of the word "death?"

## DISQUALIFICATION OF COUNTY ATTORNEY'S OFFICE

Several years before defendant became involved in this case, he was represented by the Public Defender's office during prosecution on a different charge. At that time, Rudolph Gerber was a member of the Public Defender's office. Subsequently, Mr. Gerber joined the Maricopa County Attorney's office. He worked strictly in an administrative capacity and had no part in defendant's prosecution for Count II. He did, however, prosecute defendant for Count I.

Prior to trial on Count II, defendant moved to disqualify the Maricopa County Attorney's office from prosecuting the case, citing as a source of conflict of interest Mr. Gerber's former employment with the Public Defender. This motion was denied. Relying upon *State v. Latigue,* 108 Ariz. 521, 502 P.2d 1340 (1972), defendant now argues that this denial was error, because the appearance of impropriety should have dis-

qualified the County Attorney's office.[1] We disagree.

In *Latigue,* a Deputy Public Defender, who had himself represented Latigue, became a Deputy County Attorney, while the prosecution in that same case was ongoing, albeit by a different member of the County Attorney's office. This Court imputed the Deputy County Attorney's knowledge of confidential information about Latigue to all members of the County Attorney's office and precluded that office from prosecuting.

█ The facts of the instant case are clearly distinguishable from those in *Latigue.* Mr. Gerber did not himself represent defendant in the prior case, and he testified at a pre-trial hearing that he had spoken to no one at the Public Defender's office regarding that case and, therefore, knew nothing about it. Thus, he possessed no confidential information about the defendant from which to impute knowledge to the County Attorney's office. *See State v. Lozano,* 121 Ariz. 99, 588 P.2d 841 (App.1978). Additionally, *Latigue* was concerned with involvement in the *same* case by a former Public Defender who subsequently became a Deputy County Attorney. Mr. Gerber worked at the Public Defender's office when it represented defendant in another case. We find no error.

## FACTUAL BASIS FOR GUILTY PLEA

█ Following defendant's conviction for Count II the murder of Neva Lee, he abruptly pled guilty to Count I, the slaying of Sandy Spencer, shortly after trial had begun on this charge. Defendant contends that there was no factual basis for the plea, as required by 17 A.R.S., Rules of Criminal Procedure, rule 17.3. He argues that there was no attempt by the trial court to determine whether he acted with malice.

We disagree. It is readily apparent from the transcript of the plea hearing that the trial court did not merely ascertain that the defendant committed the death-causing act,

as defendant now contends. At this hearing, the defendant admitted that he intended to cause the death of the victim, and such intent expressly demonstrates malice. *See* A.R.S. § 13–451 B. The following colloquy took place between the defendant and the prosecutor, who was questioning him at the court's direction:

"Q. Did you do these injuries to her body while she was still alive?

"A. No.

"Q. You did it after she had been killed?

"A. I did it when I thought she was dead to make sure."

\* \* \* \* \* \*

[Further examination by the Court]

"Q. When you forced dirt into Sandy Spencer's mouth and up her nose, did you do it with the intention of killing her?

"A. Yes."

Additionally, defendant's testimony at this hearing demonstrates his lack of excuse or justification for the killing:

[Examination by the Court]

"Q. Why did you kill her?

"A. No reason.

\* \* \* \* \* \*

"A. She got me mad about something and I tied her up first. Then after that, that's when I killed her."

Defendant also contends that his guilty plea should have been set aside because of his "almost immediate recantation," because:

"[I]f a defendant pleads guilty to a criminal charge, and in the next breath contravenes the plea by asserting facts which, if true, would establish that he is not guilty, then his guilty plea is of no effect and should be rejected." *Commonwealth v. Roundtree,* 440 Pa. 199, 202, 269 A.2d 709, 711 (1970).

The foregoing legal principle refers to a defendant's contradictory statements made in the presence of the judge at the plea proceedings, a situation that would "show

---

1. We need not reach the issue of the propriety of Mr. Gerber's direct prosecution of defendant in Count I, because defendant ultimately pled guilty to that count, and a guilty plea consti-

tutes a waiver of all non-jurisdictional defects. *State v. Lerner,* 113 Ariz. 284, 551 P.2d 553 (1976); *State v. Murphy,* 97 Ariz. 14, 396 P.2d 250 (1964).

that the plea was not entered with a complete comprehension of its impact." *Commonwealth v. Roundtree,* 440 Pa. at 202, 269 A.2d at 711. Defendant's alleged "recantation" consisted of an angry statement to a detective who had goaded him *after* the plea proceeding. Defendant called him an epithet and said, "You know I didn't do it." This statement has no bearing on the validity of defendant's guilty plea, which we find, after examination of the entire plea hearing transcript, to have been knowingly, intelligently and voluntarily made, as well as factually based.

## CHANGE OF VENUE

Defendant next alleges as error the trial court's denial of his motion for a change of venue. He contends that this denial was an abuse of discretion, because the publicity in the case was "so massive that most intelligent residents of Maricopa County had some prior knowledge of it."

■ Prior knowledge of a case, however, does not by itself disqualify a juror. *See Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). A juror need not be totally ignorant of the facts and issues involved if he is able to lay aside his impressions or opinions and render a verdict based on the evidence. *Murphy v. Florida, supra; Irvin v. Dowd, supra; State v. Smith,* 116 Ariz. 387, 569 P.2d 817 (1977). We have carefully reviewed the transcript of the jury's individual voir dire questioning. Five of the panel members who ultimately tried the defendant had no knowledge whatsoever of the case. The other seven vaguely remembered hearing minimal information about the case from T.V. or newspaper coverage. The trial court ascertained, through questioning, that the jury members were determined to reach a verdict based solely on the evidence presented at trial.

■ Under certain circumstances, a defendant may be entitled to a change of venue, because of pre-trial publicity, without an examination of the effect of the publicity upon the jury members. Thus, in a number of cases in which the influence of news media was deemed so outrageous that it pervaded the proceedings, prejudice has been presumed. *See Murphy v. Florida, supra.* These cases include *Rideau v. State of Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Estes v. State of Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), *rehearing denied,* 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118 (1965) and *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). After an examination of newspaper publicity submitted into evidence by the defendant, we conclude that the publicity was a factual representation of the events depicted and was not inflammatory. The influence of the media was, therefore, not outrageous, and no prejudice may be presumed.

Additionally, defendant argues that 17 A.R.S., Arizona Rules of Criminal Procedure, rule 10.3 imposes a less stringent standard for requiring a change of venue than the constitutional standard. Rule 10.3.b provides:

"b. Whenever the grounds for change of place of trial are based on pretrial publicity, the moving party shall be required to prove that dissemination of the prejudicial material will probably result in the party being deprived of a fair trial."

■ We find the standard imposed by rule 10.3.b commensurate with the constitutional standard. The probability of a resulting unfair trial, required to be proven under 10.3.b, may be shown by demonstrating that the material is so outrageous that prejudice must be presumed. Since we have found no such prejudice, the trial court did not err in denying a change of venue.

## EXPERT PUBLIC OPINION RESEARCHER AND JURY SELECTION EXPERT

Several months before trial, defendant moved the court to appoint an expert to substantiate his claim that pre-trial publicity necessitated a change of venue. He re-

quested $500 to hire an Arizona State University professor to conduct a telephone survey of 200–300 registered voters in Maricopa County in order to ascertain the degree of saturation of pretrial publicity. Defendant also moved the court to appoint a jury selection expert. Both motions were denied.

■ Defendant bases his claim that the denials were error on A.R.S. § 13–1637 B,[2] which provides:

"When a person is charged with a capital offense the court may on its own initiative and shall upon the application of the defendant and a showing that the defendant is financially unable to pay for such services, appoint such investigators and expert witnesses as are reasonably necessary adequately to present his defense at trial and at any subsequent proceeding. * * *."

This Court interprets the above language to preclude the appointment of the requested experts. Jury selection and proceedings for change of venue are not matters having a bearing on the ultimate question of defendant's guilt or innocence and, therefore, are not contemplated by the statute's requirement of necessity "to present his defense at trial * * *." The trial court correctly ruled against defendant in refusing to appoint these experts.

## JURY QUESTIONING

The trial court, in Count II, began jury selection by requiring the prospective jurors to complete a lengthy questionnaire. One of the included questions was:

"35. A person convicted of First Degree Murder may be punished by life imprisonment or by death. If Mr. Smith is found guilty of First Degree Murder, the Court—that is the Judge without any verdict or advice from the Jury—then must determine the punishment.

"A. Do you entertain conscientious or religious opinion concerning the death penalty which would prevent you from finding the defendant guilty even though you are satisfied beyond a reasonable doubt from the evidence that he is in fact guilty of First Degree Murder? Yes ____ No ____"

This type of questioning has been recently upheld by this Court. *State v. Ramirez,* 116 Ariz. 259, 569 P.2d 201 (1977). See also *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Witherspoon v. State of Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *rehearing denied,* 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968).

■ Nevertheless, defendant challenges both *Ramirez* and *Witherspoon* and presents a two-fold attack upon Question 35. First, he argues that it impermissibly interjects the issue of punishment into the minds of the prospective jurors, citing authority for the principle that it is error to inform the jury of the possible punishment awaiting the accused if he is convicted. *State v. Zuidema,* 157 Mont. 367, 485 P.2d 952 (1971). In that case, the court informed the jury of the range of punishment in its final instructions, although there was no legitimate reason to do so at that particular time. In the instant case, there was a valid purpose for informing the jury of the potential for a death penalty: the determination of a bias, which would prevent a juror from performing his duty.

■ Defendant also contends that the voir dire question caused a biased jury, because it "eliminates from the jury those persons who abhor the death penalty, but at the same time it leaves on the jury any person * * * whose judgment * * * would be clouded by this desire to see the defendant suffer the supreme penalty."

We reject this argument, which is unsupported by any authority whatsoever, as unpersuasive and illogical. As the United States Supreme Court has observed:

"It is entirely possible * * * that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be

2. Now renumbered § 13–4013 B, effective October 1, 1978.

his duty to abide by his oath as a juror and to obey the law of the State." *Witherspoon v. State of Illinois,* 391 U.S. 510, 514–515, n. 7, 88 S.Ct. 1770, 1773, n. 7, 20 L.Ed.2d 776, 781, n. 7 (1968). Similarly, it is unreasonable to conclude that an individual would vote to convict a defendant he believes innocent solely to bring about his execution.

## DISCOVERY

■ Defendant objects to the state's failure to disclose that one of its witnesses, John Jamison, had three prior felony convictions. Defense counsel did not impeach Jamison with the prior felony convictions, because those convictions were unknown to them at the time of the trial.

Sometime during the investigation of the defendant, the prosecution obtained an F.B.I. rap sheet on Jamison. This document indicated that Jamison had been charged with various offenses that very likely would have been felonies. However, no disposition of those charges was included. Thus, the prosecution had no reason to believe that Jamison had been convicted of a felony.

The prosecutor testified at a hearing held after trial that he believed that the rap sheet had been turned over to Louis A. Moore, Jr., who initially represented the defendant. Stephen Rempe and David Basham, who succeeded Moore as counsel, indicated that they had not received a copy of Jamison's rap sheet before the conviction.

Defendant filed a timely motion for disclosure requesting, among other things, a list of all material required to be disclosed under 17 A.R.S., Rules of Criminal Procedure, rule 15.1.a(7).[3] In response to this motion, the court directed defense counsel to review the files in the Sheriff's office to ascertain if they had not received any re-

ports. Defense counsel neglected to review the files.

Subsequently, counsel filed a motion for disclosure of impeaching information seeking "any and all records or information revealing felony convictions attributed to any witnesses." Neither this nor the preceding motion was directed specifically to Jamison or any other witness. The motions simply requested that which was already required to be disclosed by rule 15.1.a(7).

After defendant had been found guilty, counsel obtained Jamison's rap sheet from the Sheriff's office. They then corresponded with authorities in Ohio regarding the arrests shown on the rap sheet and discovered three felony convictions. Counsel moved for a new trial. Defendant now argues that the court erred in denying this motion, because the prosecution failed to disclose these prior convictions in contravention of due process and 17 A.R.S., Rules of Criminal Procedure, rule 15.1.

The United States Supreme Court in *Brady v. State of Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), affirmed a lower court's holding that suppression of exculpatory evidence, which was known to the prosecution but unknown to the defense, violated due process. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). *See also Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In the instant case, the fact of Jamison's prior felony convictions was *not* known to the prosecution. We, therefore find no constitutional violation.

Rule 15.1.a(7) requires the prosecution to make available all information tending to mitigate the defendant's guilt, including "all prior felony convictions of witnesses whom the prosecutor expects to call at trial." Rule 15.1.d further provides:

\* \* \* \* \* \*

"(7) All material or information which tends to mitigate or negate the defendant's guilt as to the offense charged, or which would tend to reduce his punishment therefor, including all prior felony convictions of witnesses whom the prosecutor expects to call at trial."

---

**3.** *"Rule 15.1 Disclosure by state*

"a. *Matters Relating to Guilt, Innocence or Punishment.* No later than 10 days after the arraignment in Superior Court, the prosecutor shall make available to the defendant for examination and reproduction the following material and information within his possession or control:

"The prosecutor's obligation under this rule extends to material and information in the possession or control of members of his staff and of any other persons who have participated in the investigation or evaluation of the case and who are under the prosecutor's control."

The state asserts that a reading of rule 15.1.a(7) together with rule 15.1.d mandates that the prosecutor is not required to disclose information, such as a conviction record from another state, which neither he nor those under his control possesses. Defendant asserts that the prosecutor has a duty to ascertain the information from other government agencies.

 We hold that the state has an obligation pursuant to rule 15.1 to disclose such information not in its possession or under its control if the state has better access to the information; if the defense shows that it has made a good faith effort to obtain the information without success; and if the information has been specifically requested by the defendant.

 In the instant case, the state did have better access to the information. Another law enforcement authority is far more likely to co-operate with the prosecution than with defense counsel. We find, however, that the defense did not show that it had made an unsuccessful good faith effort to obtain the information, nor did it specifically request Jamison's prior felony convictions. Without such a specific request, the state was not put on notice of precisely what the defendant was seeking and understandably believed it had satisfied defendant's general request by turning over the rap sheet. Under these circumstances, to require the state to investigate all such potential felony convictions of all its witnesses when the deficiencies of the F.B.I. report are not indicated to the prosecution would be an unfair burden. Counsel should have brought the omitted dispositions to the state's attention. That they were unaware of the existence of the rap sheet was the

result of their own lack of diligence. They were remiss in failing to inspect the Sheriff's records as directed by the court and as they finally did after trial. We find no error.

## SUPPRESSION OF EVIDENCE

While the defender was under surveillance as an investigative lead in the Lee and Spencer murders, the police set up a decoy hitchhiker who was, in fact, Deputy Sheriff Donna Crowe. Defendant picked up Officer Crowe and, with her consent, drove her to a machine shop that was owned by his father.

While in the shop, defendant grabbed Officer Crowe. When he would not release her, after she protested and struggled to break free, Officer Crowe became frightened and gave a prearranged verbal signal, which was picked up by a monitoring device held by police outside the building. These officers broke into the shop, arrested defendant and secured the building. After the defendant and his father had given consent, various articles of incriminating evidence were seized from the shop, defendant's car, and the home he shared with his parents. At a suppression hearing held prior to trial, the Superior Court ruled the evidence thus seized admissible. Defendant again challenges the admissibility of the evidence on several theories.

 Preliminarily, we point out that the trial court's rulings on a motion to suppress will not be disturbed on appeal absent clear and manifest error. *State v. Walker,* 119 Ariz. 121, 579 P.2d 1091 (1978); *State v. Dugan,* 113 Ariz. 354, 555 P.2d 108 (1976). Also, we note that this Court need not consider the admissibility of the evidence seized from the machine shop, because the record demonstrates that none of this evidence was introduced at trial.

Although not raised by defendant,[4] we first address a potential defect in defendant's arrest procedure, which could argu-

---

4. This Court is statutorily mandated to search the record for fundamental error in criminal cases. *See* A.R.S. § 13–4035 B. *See, e. g.,*

*State v. Diaz,* 121 Ariz. 16, 538 P.2d 309 (1978); *State v. Bradley,* 99 Ariz. 328, 409 P.2d 35 (1965).

ably lead to invalidation of the evidence seized as "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Examination of the record shows that the police entered the machine shop without complying with A.R.S. § 13–1411,[5] Arizona's "knock and announce" statute. In *State v. Cook,* 115 Ariz. 188, 564 P.2d 877 (1977), we stated that § 13–1411 does not provide exceptions for exigent circumstances. This statement was not necessary to the decision therein, since we expressly found no exigent circumstances involved in the *Cook* entry. Nor has this Court applied the *Cook* dictum in subsequent decisions.

Our research reveals substantial judicial acceptance of exceptions under exigent circumstances to similar "knock and announce" statutes. *See, e. g., Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Rodriguez v. Butler* 536 F.2d 982 (2nd Cir. 1976), *cert. denied,* 429 U.S. 943, 97 S.Ct. 362, 50 L.Ed.2d 313; *United States v. Cisneros,* 448 F.2d 298 (9th Cir. 1971); *People v. Maddox,* 46 Cal.2d 301, 294 P.2d 6 (1956), *cert. denied,* 352 U.S. 858, 77 S.Ct. 81, 1 L.Ed.2d 65.

In an oft-quoted passage from *People v. Maddox,* 46 Cal.2d 301, 306, 294 P.2d 6, 9, Justice Traynor expressed the rationale for the judicial exception to the California statute:

"It must be borne in mind that the primary purpose of the constitutional guarantees is to prevent unreasonable invasions of the security of the people in their persons, houses, papers, and effects, and when an officer has reasonable cause to enter a dwelling to make an arrest and as an incident to that arrest is authorized to make a reasonable search, his entry and his search are not unreasonable. * * [N]o basic constitutional guarantees are violated because an officer succeeds in

getting to a place where he is entitled to be more quickly than he would, had he complied with [the statute]. Moreover, since the demand and explanation requirements of [the statute] are a codification of the common law, they may reasonably be interpreted as limited by the common law [rule] that compliance is not required if the officer's peril would have been increased * * *. Without the benefit of hindsight and ordinarily on the spur of the moment, the officer must decide [this question] in the first instance."

■■■ We find this logic equally persuasive when the officers are justified in the belief that a person within is in imminent peril of bodily harm. This exception has been recognized by the Supreme Court in *Sabbath v. United States,* 391 U.S. 585, 591 n. 8, 88 S.Ct. 1755, 1759, n. 8, 20 L.Ed.2d 828, 834, n. 8 (1968) citing Mr. Justice Brennon's dissent in *Ker v. California, supra. See United States v. Fluker,* 543 F.2d 709 (9th Cir. 1976). Accordingly, the *Cook* dicta is disapproved, and we hold that a more enlightened interpretation of § 13–1411 requires an exception in a case such as this, when the police have been confronted with the exigent circumstance of imminent peril to a person within the building.

Defendant contends that there was no probable cause to arrest him for the "Donna Crowe incident" as required by A.R.S. § 13–1403,[6] which reads in pertinent part:

"§ 13–1403 *Arrest by officer without warrant.*

"A peace officer may, without a warrant, arrest a person:

"1. When he has probable cause to believe that a felony has been committed and probable cause to believe the person to be arrested has committed the felony."

\* \* \* \* \* \*

---

**5.** A.R.S. § 13–1411 provides:

"An officer, in order to make an arrest either by virtue of a warrant, or when authorized to make such arrest for a felony without a warrant, as provided in § 13–1403, may break open a door or window of any building in which the person to be arrested is or is reasonably be-

lieved to be, if the officer is refused admittance after he has announced his authority and purpose." Renumbered § 13–3891, effective October 1, 1978.

**6.** Now renumbered § 13–3883, effective October 1, 1978.

Defendant argues that all of the evidence gathered by the searches is the direct result of the "illegal" arrest and, thus, should have been suppressed.

We find that the police had ample, objective indications, because of the transmissions over the monitoring device, that Officer Crowe was being held in the shop by defendant against her will. *See State v. Pederson,* 102 Ariz. 60, 424 P.2d 810 (1967), *cert. denied,* 389 U.S. 867, 88 S.Ct. 138, 19 L.Ed.2d 142. This, coupled with their knowledge of defendant's prior rape convictions, gave them probable cause to believe a felony was being committed by defendant,[7] and the arrest was valid.[8] *See Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

Defendant also asserts that his written consent to allow the search of his car was involuntarily given. He cites *State v. Ballesteros,* 23 Ariz.App. 211, 531 P.2d 1149 (1975), as setting forth various factors indicative of coerced consent. Defendant claims that his consent was involuntary, pursuant to *Ballesteros,* because he was under arrest, had denied his guilt, refused to give consent until his father was called, and was aware of the incriminating evidence contained in his car. Additionally, defendant challenges the validity of his consent, because he was not made aware that he had the right to withhold consent.

█ The United States Supreme Court has held that the voluntariness of a consent to search is a question of fact to be determined from the totality of circumstances involved. *Schneckloth v. Bustamonte,* 412

U.S. 218, 98 S.Ct. 2041, 36 L.Ed.2d 854 (1973). *See also State v. Watson,* 114 Ariz. 1, 559 P.2d 121 (1976), *cert. denied,* 430 U.S. 986, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977). The *Schneckloth* decision also expressly held that the state need not establish an accused's knowledge of his right to refuse consent. While such knowledge is one factor to be considered in determining voluntariness, it is not the *sine qua non* of effective consent. *See also United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), *rehearing denied,* 424 U.S. 979, 96 S.Ct. 1488, 47 L.Ed.2d 750 (1976); *State v. Knaubert,* 27 Ariz.App. 53, 550 P.2d 1095 (1976); *State v. Ballesteros, supra.*

█ It is true that several of the factors cited in *Ballesteros supra,* as indicative of coerced consent are present in the instant case. Defendant was under arrest and denied his guilt. The record does not reflect, however, whether defendant consented to the car search before or after speaking to his father. As for his awareness of the incriminating evidence contained in the car, the state persuasively argues that defendant did not consider the articles incriminating.[9] Upon being asked to search his vehicle, he immediately stated, "You won't find any evidence."

Moreover, there are several indicia that defendant voluntarily consented to the search, almost all of which were considered indicative of voluntary consent in *United States v. Watson, supra.* There are no overt acts or threats of force against defendant either proven or claimed. No

---

**7.** At the suppression hearing, Sergeant Ed Calles, who was one of the two police officers in charge of the decoy operation, testified that the transmissions led him to believe that the defendant was holding Donna Crowe against her will, thereby committing the crime of false imprisonment.

**8.** In conjunction with this issue, defendant seems to be obliquely advancing an entrapment argument. We note, therefore, that entrapment requires activity by the state which induces an accused to commit a crime which he would not otherwise have committed. Merely providing the opportunity to commit the of-

fense is not sufficient. *State v. Masengill,* 110 Ariz. 310, 518 P.2d 560 (1974). *State v. McKinney,* 108 Ariz. 436, 501 P.2d 378 (1972). The fact that Officer Crowe was a hitchhiker and voluntarily entered the shop with defendant cannot be characterized as inducing him to hold her at the shop against her will.

**9.** These articles, rope and adhesive tape found in the trunk of defendant's car, were not items of evidence that by themselves would immediately connect the defendant to the murders, unlike blood-stained articles, the victim's possessions, or deadly weapons.

promises were made to him, nor are there indications of more subtle forms of coercion. Defendant was neither mentally deficient nor unable to exercise free choice; to the contrary, he was a man of average education and superior intelligence. He was familiar with police investigations from past experience, and he knowingly waived his *Miranda* rights. From his comment, "You won't find any evidence," it is apparent that defendant was aware that the results of the search could be used against him. We conclude that the totality of circumstances, as presented by the record, supports the trial court's ruling that defendant's consent was voluntary.

Finally, defendant argues that the police searched his car prior to obtaining his consent. This allegation is not supported by the record.

## JURY POLL

Defendant asserts that the record reflects the polling of only eleven of the twelve jurors after defense counsel indicated his desire to have the jury polled following its guilty verdict. This, defendant claims, casts substantial doubt on whether the verdict was unanimous.

At an evidentiary hearing ordered by this Court, however, the Superior Court found that all twelve jurors had been properly polled. The original transcription of the proceedings had been improperly prepared and had omitted the polling of one juror. This was corrected in an amended transcript, which demonstrates that no error was committed.

## MITIGATION

Prior to sentencing, the prosecution presented evidence of aggravating circumstances warranting the death penalty. A.R.S. § 13–454.E.[10] Defense counsel argued against a death sentence by countering with evidence pursuant to A.R.S. § 13–

154.F.1,[11] which specifies the following mitigating factor:

"[Defendant's] capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."

In order to establish that defendant's capacity was impaired, the defense presented the testimony of a psychiatrist and a psychologist who testified that defendant was a borderline psychotic whose behavior was compulsive.

The state rebutted this testimony with that of another psychiatrist, Dr. Michael Cleary, who opined that the defendant did not act out of compulsion and was not impaired in his ability to conform his conduct to the law. The court, at sentencing, found the existence of aggravating circumstances and expressly found no mitigating circumstances.

Defendant now argues that the court erred in failing to find the alleged mitigating factor. He cites a portion of the transcript of Dr. Cleary's testimony to support his contention that Dr. Cleary's evaluation was not based on an examination of defendant, but was based instead solely on unsubstantiated statements from police officers contained in police reports.

We find this contention untrue. An examination of the transcript makes it apparent that Dr. Cleary based his evaluation on both his interview with the defendant and on police reports.[12] It is well-settled in Arizona that a medical doctor may give expert testimony based in part on hearsay. *State v. Treadaway*, 116 Ariz. 163, 568 P.2d 1061 (1977); *State v. McGill*, 101 Ariz. 320, 419 P.2d 499 (1966). Moreover, we find that there was sufficient evidence, adduced through Dr. Cleary's testimony, to support the trial court's determination that the defendant could appreciate the wrongfulness

---

10. Now renumbered A.R.S. § 13–703.F., effective October 1, 1978.

11. Now renumbered A.R.S. § 13–703.G.1, effective October 1, 1978.

12. The doctor testified that he utilized the police reports to familiarize himself with the facts surrounding the crime.

of his acts or could conform his conduct to the requirements of law. The court's refusal to find the existence of the suggested mitigating factor was clearly not an abuse of discretion when the evidence concerning defendant's condition was contradictory.

## DEATH PENALTY STATUTE

In July 1978, this Court held A.R.S. § 13–454 F, part of Arizona's death penalty statute, unconstitutional, because it limited a defendant's right to show mitigating circumstances. *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied*, 99 S.Ct. 1258 (1979). *See Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). We then went on to find this constitutionally infirm section of the statute severable and upheld the remaining portion of the statute.

Defendant now argues that the statute was not severable and should have been treated as void in its entirety. Additionally, defendant contends that by declaring a section of the death penalty statute unconstitutional, this Court has brought into effect Chapter 138, § 10 of the Session Laws of the 1973 Legislature,[13] and all persons who have received a death sentence must now be resentenced to life imprisonment. Both of these arguments have been adequately dealt with in the Supplemental Opinion to *State v. Watson, supra*, and we are not persuaded to change our opinion. However, because defendant was sentenced prior to *Watson* and pursuant to the limited mitigation of A.R.S. § 13–454.F, we remand for resentencing to allow him to present any mitigating circumstances tending to show that the death penalty should not be imposed.

## SENTENCE

Defendant was sentenced by the trial court to "be punished for this crime by administration of lethal gas in the lethal gas chamber within the walls of the Arizona State Prison in Florence, Arizona." He argues that A.R.S. § 13–453 provides for only two possible sentences for first degree murder, death or life imprisonment, and that the above sentence is unlawful, because it omits the word "death." We need not decide this issue, however, because we have remanded for resentencing.

The convictions of the Superior Court are affirmed. The cases are remanded to that court for resentencing.

CAMERON, C. J., and HAYS and HOLOHAN, JJ., concur.

STRUCKMEYER, Vice Chief Justice (specially concurring):

I concur in the result.

---

13. Session Laws of 1973 Legislature, Chapter 138, § 10 provides: "In the event the death penalty is held to be unconstitutional on final appeal, a person convicted of first degree murder or another offense punishable by death who has been sentenced to die shall be resentenced by the sentencing court to life imprisonment without possibility of parole until the person has served a minimum of twenty-five calendar years."