686 P.2d 1265

**STATE of Arizona, Appellee,**

v.

**Anthony Lee CHANEY, aka Allan Saunders-Coleman, aka Alan Coleman, Appellant.**

No. 5894.

Supreme Court of Arizona, En Banc.

July 26, 1984.

**300**

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and Diane M. Ramsey, Asst. Attys. Gen., Phoenix, for appellee.

William B. Hurst, Flagstaff, for appellant.

HAYS, Justice.

Appellant, Anthony Lee Chaney, was tried by jury and found guilty of first degree murder, kidnapping, aggravated assault, two counts of aggravated robbery, and one count each of burglary and theft. He was sentenced to 28 years imprisonment for the kidnapping; 21 years for the aggravated assault; 28 years for one count of armed robbery; 28 years for the other count of armed robbery; 20 years for burglary; and 11.5 years for theft; each sentence is to run consecutively to the previous sentence. He was sentenced to death for the murder conviction. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3); and A.R.S. §§ 13-4031, 4035.

FACTS

Chaney and his "wife," Deanna (he was married to another when he "married" the woman who was also his codefendant) were out of Arizona when their crime spree began. They burgled several homes in other states before entering Arizona. At one home they found several guns which they took. After leaving and driving some distance, Chaney decided to re-burgle that home to make sure he did not miss any weapons. Chaney was described as a "gun nut," who knew quite a bit about them.

In New Mexico they were burgling a home when they discovered a late-model black Ford pickup with plates bearing the letters WMD. They transferred their booty to the truck and left their own vehicle somewhere in New Mexico.

They entered Arizona as the 1982 Labor Day Holiday began. They heard that DPS was setting up roadblocks to check for drunk drivers and they did not want to be stopped, so they decided to find a rural area and camp until the holiday was over. Later, a Coconino County sheriff's deputy saw them and, because it was unusual to see people camping there, he decided to investigate. As the deputy approached the campsite, he called in the description of the vehicle and its plates. He drove up behind the pickup and he exited his vehicle. He asked Chaney for identification, and Chaney said it was in his truck and that he would retrieve it. The deputy talked to Deanna and suddenly Chaney was back with a gun pointed at the deputy's head. Deanna took the deputy's side arm. Chaney told Deanna to give him the AR-15 rifle (the civilian version of the M-16). While Chaney was pointing the rifle at the deputy, he told the deputy to kneel. The deputy complied and, in fear of losing his life, began talking to Chaney in hopes of avoiding death. He told Chaney about his family and also that Chaney could handcuff him to a tree and thereby escape.

While this was going on, the dispatcher determined that the pickup was stolen and tried to inform the deputy. When there was no answer, the dispatcher called a second officer, who would be the victim, to investigate. Because the area is rural, there was some difficulty in locating the first deputy's exact position.

Chaney, who said he needed "more control" of the situation, handcuffed the first deputy to the tree, told Deanna to disable the two-way radio in the deputy's vehicle, and took its keys. Chaney and Deanna drove off. When he felt it was safe, the deputy took out a spare key and unhandcuffed himself and ran to the radio.

At the same time, the victim was progressing slowly up the dirt road, checking areas along the way. Suddenly he saw Chaney's vehicle. He called in and asked, "Black Ford pickup?" Chaney stopped his vehicle, jumped out with the AR–15 in hand and fired it while advancing on the deputy's vehicle. The first deputy was talking with the dispatcher describing the assailants when he heard the gunfire; he grabbed his shotgun and ran towards the gunfire.

The victim threw himself to the seat to avoid the bullets as Chaney began firing. Over thirty bullets were fired. Glass and other debris were flying around the vehicle and over two hundred objects struck the deputy. One of the bullets nearly severed the deputy's left arm. Finally, Chaney was within nine feet of the deputy and to his rear. Chaney fired again, leaving powder burns on the victim's body.

Chaney returned to the truck, and he told Deanna: "Murder One" and "reload." As they were leaving, Deanna saw the victim try to drive his car, but he could not.

The victim, who was a doctor and only a part-time deputy, was conscious for about thirty minutes after the attack. When the medics arrived he told them: "I'm dying, I'm dying" and "I can't breathe."

Chaney saw two boys in another pickup later in the same general area. He decided to take their pickup because the police had a description of his. Deanna went to the passenger window of the boys' pickup and began talking with them. Chaney came up to the driver's side, pointed his gun at the driver and told the boys to get out. They were told to kneel next to the truck. After transferring their booty, Chaney told the boys to run. They did but dodged behind trees when they could because both feared a bullet in the back. Before telling the boys to run, Chaney told them that he had handcuffed one deputy to a tree and had shot another.

Chaney headed to Flagstaff to put gas in the pickup he had just stolen. Within minutes the police were in contact with the boys and sent out a description of the new vehicle. In Flagstaff the police spotted the vehicle but hoped to allow Chaney to leave Flagstaff before attempting an arrest. There were many police cars in the area and Chaney remarked that he was in their midst and they did not realize it. Soon the police realized that surprise was gone and they moved in. After arrest, Chaney asked how the deputy was doing, to which the arresting officer said "shut up."

On appeal, Chaney raises issues relevant basically only to the murder conviction.

## JURY ISSUES

Chaney argues that failing to grant his motion for change of venue was reversible error. We disagree.

This case received extensive coverage in the media in the Flagstaff area, where the crime occurred. Almost all the jurors, on voir dire, indicated they had heard about the murder.

The murder also aroused a feeling of remorse in the members of the community. The victim was a young medical doctor and was an on-duty reserve deputy when he was shot. His patrol car was riddled with bullets; he was shot several times, and his body was struck over two hundred times by flying glass and other objects. Many members of the venire panel expressed regret that the victim died and the manner of death.

█ A defendant is entitled to a fair and impartial trial. *See State v. Greenawalt*, 128 Ariz. 150, 163, 624 P.2d 828, 841, *cert. denied*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981). This is guaranteed by the United States Constitution, U.S. Const. amends. 5, 14, and the Arizona Constitution, Ariz. Const. art. 2, § 4.

Motions for change of venue are made under 17 A.R.S. Rules of Criminal Procedure, rule 10.3. The standard under which these motions are judged is commensurate with the constitutional standard, *see State v. Smith*, 123 Ariz. 231, 236, 599 P.2d 187, 192 (1979); that is, whether the individual "juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961).

When publicity pervades the court proceedings to the extent the proceedings have a "carnival atmosphere," *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), prejudice is presumed, *State v. Smith, supra*, 123 Ariz. at 236, 599 P.2d at 192. Circumstances analogous to *Sheppard, supra*, or *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), have not been alleged by Chaney.

In other cases concerning alleged prejudicial publicity, the defendant has the burden of proving that the information disseminated concerning the act for which he is tried probably will have the result of depriving him of a fair trial. Rule 10.3(b); *State v. Tison*, 129 Ariz. 526, 534, 633 P.2d 335, 343 (1981). Defendant must show that the jurors have formed preconceived notions concerning the defendant's guilt and that they cannot lay those notions aside. *State v. Mulligan*, 126 Ariz. 210, 214, 613 P.2d 1266, 1270 (1980); *Irvin v. Dowd, supra*, 366 U.S. at 723, 81 S.Ct. at 1642–43 ("mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is ... [insufficient] to rebut the presumption of a prospective juror's impartiality ...."). It follows that prior knowledge of a case is not sufficient, standing alone, to disqualify a juror. *State v. Smith, supra*, 123 Ariz. at 236, 599 P.2d at 192. We note that the prejudicial effect, not the extensiveness, of the publicity is the key. *Greenawalt, supra*. Change of venue will not be granted if the court finds that the jurors can lay aside any preconceived notion and render a verdict based on the evidence presented during trial. *State v. Smith, supra; Irvin v. Dowd, supra*. The trial court's decision will not be disturbed absent an abuse of discretion. *State v. Ferrari*, 112 Ariz. 324, 332, 541 P.2d 921, 929 (1975).

We have carefully reviewed the record and we conclude that the trial court did not abuse its discretion. The instant case is similar to *Greenawalt, supra*. In *Greenawalt* the *voir dire* took place six months after arrest. In this case the *voir dire* took place five months after arrest, which occurred on the same day the murder took place. Most of the jurors who knew some of the facts of this case had forgotten much of what they had read or heard. Most of the jurors told the judge they could try the case solely on the evidence presented in court. Only six jurors said they could not fairly judge this case; they were excused. In *Greenawalt* four jurors were excused because they could not set aside a previously formed opinion. Finally, in this case the judge noted on the record that he believed all the members of the venire panel were being honest in answering his questions. We find the trial judge did not abuse his discretion by denying the motion for change of venue.

Chaney argues that another juror should have been struck for cause because the juror had allegedly made statements to other jurors concerning Chaney's guilt. The court questioned the juror as follows:

Q. BY THE COURT: One more question. I know you're nervous. Did you make the statement yesterday or something to this effect: The Defendant is obviously guilty. I don't know why we are here using the taxpayer's money. Did you make a statement to that effect?

A. We were talking about the taxpayer's money, I recall that. We were saying, okay, if you had $12.00, and everybody here had $12.00, and let's say there was a hundred people brought in, and the person I was with, we were joking about that, but it was not—

Q. Did you make the statement that the Defendant was obviously guilty, or something to that effect?

A. If I made that statement, I didn't mean he was guilty, I just meant there was a lot of people here, and we were talking about the taxpayer's money. But if that is the statement you are referring to, then I could have possibly said that.

Q. Could you lay aside any feelings that you had prior to the beginning of this proceeding yesterday and judge this case fairly and impartially on the evidence presented in the Court and the instructions given by the Court?

A. Are you saying could I?

Q. Yes.

A. Yes.

Q. If you can recall, was anybody involved in that conversation with you who is now a member of the panel?

A. No.

█ Whether a juror can render a fair and impartial verdict is a decision for the trial court. *State v. Rose*, 121 Ariz. 131, 139, 589 P.2d 5, 13 (1978). The trial court, which has the opportunity to observe "the prospective juror's demeanor and the tenor of his answers," *State v. Munson*, 129 Ariz. 441, 443, 631 P.2d 1099, 1101 (1981), "is in a position to determine first hand whether a juror can render a fair and impartial verdict," *Rose, supra*, 121 Ariz. at 139, 589 P.2d at 13. Thus, the trial court's decision will not be overruled unless a "clear showing of an abuse of discretion is" made. *Id.* On this record, we find the trial court did not abuse its discretion when it refused to strike this juror for cause. The trial court believed that the juror would render a verdict based solely on the evidence. The trial court's decision is supported by the record. Thus, Chaney was not forced to "waste" a peremptory strike to excuse this juror. We also note that Chaney has not indicated whether there was a petit jury member who he would have excused peremptorily but could not because he had used a peremptory strike to excuse the juror who made the statement.

Chaney argues that the trial judge improperly restricted the scope of *voir dire* concerning the jurors' view of the insanity defense. Chaney states in his brief that "the issue before the court in the trial of the Appellant was not whether he committed the act and/or crimes in question, but whether [his mental state was] sufficient to relieve him of liability ...." Thus, insanity was Chaney's only defense.

The trial court asked the following questions on *voir dire:*

1) Are any of you acquainted with anyone who has been treated for having a mental disorder, a neurological disorder, or a brain disorder?

2) [A] legal defense of insanity may arise in this case. Do any of you have such strong feelings about the defense of insanity that you could not set them aside and render a verdict in accordance with the evidence and instructions in this case?

Chaney claims the following questions should have been asked:

(6) Has any member of your family ever been treated for or diagnosed as having a mental disorder?

(7) Has any member of your family ever been diagnosed or treated for neurological or brain disorder?

(8) Has any member of your family ever been treated or diagnosed for an emotional disorder?

(9) What do you think of psychiatry and psychiatrists?—Is psychiatry a science or an art?

(17) Are you acquainted with anyone who has been treated or diagnosed for a mental disorder?

(18) Are you acquainted with anyone who has been treated or diagnosed for neurological or brain disorder?

(19) Are you acquainted with anyone who has been treated for or diagnosed for an emotional disorder?

(28) Are you familiar with the syndrome of temporal lobe epilepsy?

Rule 18.5(d) provides that the trial court "shall conduct the *voir dire* examination, putting to the jurors all appropriate questions requested by counsel." The rule is an expression of the minimum due process

required to ensure a fair trial. *See State v. Skaggs*, 120 Ariz. 467, 470, 586 P.2d 1279, 1282 (1978). There is a two-fold purpose for *voir dire* questions. *See State v. Melendez*, 121 Ariz. 1, 3, 588 P.2d 294, 296 (1978). The first is to determine the qualifications of the prospective jurors, *id.*, and the second is to enable the parties to intelligently exercise their challenges of the juror—both peremptory challenges and challenges for cause, *id.; State v. McMurtrey*, 136 Ariz. 93, 99, 664 P.2d 637, 643 (1983).

The trial judge is required to examine jurors on a subject if there is a nexus between the prejudice feared and an issue in the case. *Skaggs, supra*, 120 Ariz. at 470, 586 P.2d at 1282. The trial court may limit the inquiry to general questions on a topic if there are no affirmative responses from the venire men. *State v. Smith*, 114 Ariz. 415, 418, 561 P.2d 739, 742 (1977). If there is an affirmative response, the trial court has a duty to elicit some detail from the prospective juror to determine if there are grounds to challenge the juror for cause. *State v. Rose*, 121 Ariz. 131, 139–40, 589 P.2d 5, 13–14 (1978). The trial court's decisions concerning *voir dire* will not be overturned unless there is an abuse of discretion. *State v. McDaniel*, 136 Ariz. 188, 193, 665 P.2d 70, 75 (1983).

In the instant case, we think Chaney's proposed questions 6–8 and 17–19 are implicitly contained in the court's first question. Chaney's proposed question 9 has, we think, minimal relevance, if any. As to these questions we find no abuse of discretion in refusing to ask them.

Chaney's proposed question 28 is direct and relevant (Chaney's defense was that he suffered from this disease); however, we find it was not an abuse of discretion to refuse to ask it. We think the court's second question was sufficient on this issue. Ten of the thirty-four veniremen responded affirmatively to the court's first question on insanity. Each of the ten was questioned separately and individually. Several relevant questions were asked of each juror with the court concluding, except for one juror, that each juror was not subject to challenge for cause. One juror was excused for cause.

We think the *voir dire* process was efficacious in this case. Most of the jurors had no strong opinion about the defense of insanity. Those who did were asked additional questions by the judge. One of those jurors was excused for cause. As to the remaining nine jurors who responded affirmatively to the court's questions, Chaney was provided sufficient information upon which to make intelligent decisions concerning his peremptory challenges. Of the nine jurors who were questioned in greater depth, four served on the petit jury. A son of one of the nine jurors had epilepsy; this was discovered during the in-depth questioning. The juror was not excused for cause, but the juror did not serve on the petit jury. This tends to indicate a reasoned decision was made to exclude this juror. In conclusion, we think the trial court's treatment of this issue on *voir dire* was sufficient. *See State v. Schad*, 129 Ariz. 557, 567, 633 P.2d 366, 376 (1981), *cert. denied*, 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982).

Chaney claims that one juror was erroneously excused for cause. The juror was excused because the trial court determined that the juror would not follow the court's instructions because the death penalty was involved.

The dialogue between the court and the juror was as follows:

[The Court: Do you think the possible imposition of the death penalty would influence your decision in this case?]

A. Well, should the Court decide on the death penalty, I don't think I could live with that.

Q. You recognize that it is a decision that is entirely up to the Court?

A. I was thinking—I was trying to understand the question, you know, as I got to thinking about that.

Q. Let me read the question to you again and see if your response would be the same.

If the Defendant is found guilty of First Degree Murder, the Court may impose either life imprisonment or the death penalty. There are no other alternatives. The jury does not determine the sentence, that decision is solely the Court's. Do any of you have any conscientious scruples or feelings that would prevent you from voting for First Degree Murder because of the imposition of the death penalty?

A. Yes. That is, I was thinking about it, why I didn't raise my hand. Should that be the sentence, and I knew I was a juror in that case, it would be very difficult for me.

Q. Even though that is not your decision?

A. Yes.

Q. Do you think you could set aside any conscientious feelings that you might have against the death penalty and impartially weigh the evidence in this case and render a verdict in accordance with the law?

A. I'm not sure.

And later:

Q. Do you understand that the Court will give you instructions at the end of the case that you must follow?

A. Yes.

Q. Because of your conscientious scruples or feelings, do you feel you could not follow those instructions, even though I instruct you to follow them?

A. Well, I wanted to—well, of course, the Court knows that I'm under oath, and I feel that I have to be true to my own word, and I would want, you know, it's not that I can't follow the instructions of the Court, but should the decision be the death penalty, I can't live, knowing that, you know, I had something to do with that. And being a member of the jury, I feel as being involved and—

And later:

Q. I'm trying to think of how to say this to you. Your indication to me is that you would follow my instructions?

A. Yes.

Q. That you would decide the case fairly and impartially based upon the evidence presented in this courtroom?

A. Yes.

Later still the juror asked the court to repeat its original question:

Q. Do any of you have any conscientious scruples or feelings that would prevent you from voting for First Degree Murder because of the possible imposition of the death penalty?

A. I'd have to answer yes to that question. I just, you know, I didn't raise my hand then because I'm not sure I thoroughly understood the question. But I wanted the Court to know my feelings on this, when considering the jury.

Q. Let's go back through this one more time. I give you instructions at the end of the trial. Would you obey those instructions?

A. Would those instructions help you to come to a decision?

Q. No, they are just instructions for the jury.

A. I guess I'm not sure how to answer that. Because if then your decision or the Court's decision is the death penalty and I was involved in that, I would feel that that was going against my feeling.

Q. Let me try this again. If you thought it was possible that I would make a decision later to impose the death penalty, would that cause you not to follow my instructions?

A. That would cause me not to want to be a juror.

Q. But would it cause you not to follow my instructions?

A. I guess so, if the nature of this trial is only one of two choices.

Q. Would you explain that for me?

A. I guess what I'm trying to say is, my feelings regarding the death penalty would make it difficult for me to sit as a juror on this particular trial, or any trial that the decision would be either life imprisonment or the death penalty, even though I realize it's not my decision.

Q. Would that possibility cause you not to obey my instructions?

A. Well, this is all new to me, I'm not sure I understand what your instructions would be. Under oath, I would do the best that I could. I guess it's just the ultimate decision and having to live with that, is what I'm objecting to.

The juror indicated three things during this dialogue: 1) the juror did not want to be a juror because if the death penalty was imposed she could not live with herself; 2) the juror would follow the court's instructions; and 3) the juror was not certain she could follow the court's instructions. We think the judge's questioning in this case is in accordance with the law as outlined above. Although this was a difficult decision to make, we find no abuse of discretion.

RIGHT TO REMAIN SILENT

 Chaney claims that his right to remain silent was violated when the trial court called Chaney's name as a potential witness in the case. During *voir dire* the court said: "I am now going to read a list of witnesses who may be called during the trial. Please raise your hand if you know or think you might know any of these people." The court then read sixty-seven names, one of which was Chaney's. Chaney claims this obviously indicated to the veniremen that he would testify and when he did not, the jury must have concluded he had a bad motive for refusing to testify.

Although we think the court should not have read Chaney's name, we do not find this to be reversible error in this case. We cannot find any prejudice to Chaney in this case because the court's action did not unduly focus attention on Chaney's right to remain silent. *See State v. Ramirez*, 116 Ariz. 259, 262–63, 569 P.2d 201, 204–05 (1977).

 Chaney next argues that the state unlawfully commented on his right to remain silent during redirect examination of a police officer. He finds the following to be the unlawful comment:

Q. Did you ever offer in the two interviews that you have described on September 6 with this Defendant, did you ever offer Mr. Chaney the opportunity to go on a video tape?

A. Yes, I asked him if he would. I told him Deanna had given a statement on video tape. I offered him the opportunity to go on video tape and give me a statement.

Q. Tom, in the absence, did he go on that video tape?

A. He did not.

Chaney's trial counsel did not object to this testimony. *See State v. Woratzeck*, 134 Ariz. 452, 454, 657 P.2d 865, 867 (1983). Also, Chaney did not remain silent after arrest. *See State v. Tuzon*, 118 Ariz. 205, 207, 575 P.2d 1231, 1233 (1978). At the station, Chaney was interviewed and gave inculpatory responses. Finally, Chaney's trial counsel opened the door to this inquiry on cross-examination. *Woratzeck, supra.* He noted that no recording of Chaney's statements was made and asked if the police had facilities to record them. The record indicates that counsel tried to show that no recording was made because it was not in the state's best interest. We conclude that the prosecutor's questions in this case do not constitute improper comment.

RIGHT TO CONFRONTATION

 Chaney argues that the court improperly restricted his right to confrontation. He claims that he was not allowed to fully cross-examine the detective who interviewed him. *See State v. Dunlap*, 125 Ariz. 104, 105, 608 P.2d 41, 42 (1980).

This issue arises out of a misunderstanding between the investigating detective and one of his personal friends. Some time after the interview the detective went to the home of a personal friend, who was a secretary for the attorney who, at that time, represented Deanna. The detective talked with his friend about another murder suspect and his erratic behavior during the interview. The detective's friend thought he was referring to Chaney's behavior, which possibly could have aided Chaney's defense of insanity. The next day the detective and his friend realized their mutual mistake. Chaney's trial counsel extensively questioned both partici-

pants. Each testified at a pretrial hearing and at trial. The murder suspect in the other unrelated case was called at trial also. Chaney had ample opportunity to develop the issue at trial. We find no error.

DISCOVERY

Chaney argues that the state violated the basic discovery rule, rule 15.1. Chaney used an AR-15 semi-automatic rifle to kill the victim. The police found approximately thirty shell casings near the scene. The victim's vehicle was hit many times by bullets. In investigating the scene, the police noticed a tree limb which appeared to have been hit by a bullet. It was cut down, but on closer examination, the police decided the tree limb had no evidentiary value and it was destroyed. Although Chaney claims the state violated rule 15.1 and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the trial court, after listening to testimony on the issue, concluded the tree limb was irrelevant to the case. We agree.

Chaney also argues that the state withheld "certain photographs." The prosecutor said that some photos did not develop but that Chaney had all the photos the state had. The trial court found no violation of the letter or the spirit of our discovery rules, and we agree.

PHOTOGRAPHS

Chaney argues that the admission of four photographs constitutes reversible error. One photo is a full-length picture of the victim's nude body lying on the autopsy table. The head, genitals, and a bloody area of the table were masked by the trial judge. The picture depicts the bullet holes, some exposed muscle where the left arm was almost severed by a bullet, some suturing, and some bruising. Another photo depicts two bullet holes in the victim's flesh, with little blood and some bruising. Another photo shows significant bruising, many small wounds, and two large wounds, but little blood. A portion of the photo was masked by the trial judge. The last photo shows one large wound and significant suturing.

We said in *State v. Hallman*, 137 Ariz. 31, 34, 668 P.2d 874, 877 (1983), that if an item of evidence may tend to inflame, it may be admitted only if it is relevant and its probative value outweighs the danger of prejudice. The photo must tend to prove a fact at issue. *State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983). The decision is within the sound discretion of the trial court. *Hallman, supra*, 137 Ariz. at 34, 668 P.2d at 877.

The only contested issue concerning the homicide was whether Chaney had the ability to form the requisite intent to commit first degree murder. The state argued that the photos tend to prove premeditation. The state claims that in conjunction with the expert testimony, the jury could determine that the victim was lying on his side, unable to defend himself, when he was shot from the back at close range.

A total of sixty-one pages of transcript is devoted to the issue of the admissibility of the photographs. At one point the judge said: "I understand your arguments, both of you; and I'll just have to struggle with a decision tonight." Before he decided to admit the photos, the judge discussed several cases on the record with the attorneys. After he decided to admit some photos he rejected many saying: "What I'm trying to do is limit the number of photographs." Our review of the record convinces us that the trial judge admitted into evidence only those photographs whose probative value outweighed the prejudicial effect. We find no abuse of discretion.

TAPE RECORDINGS

Chaney argues that the police department tapes of the radio transmissions in this incident were erroneously admitted into evidence and their admission constitutes reversible error. The prosecutor argued that the tapes helped to show premeditation by indicating that the attack was unprovoked. The trial court found that the statements on the tape all fell within exceptions to the hearsay rules and that the probative value of the tapes outweighed the prejudicial effect. We find no abuse of

discretion. *See State v. Grilz*, 136 Ariz. 450, 453, 666 P.2d 1059, 1062 (1983).

EXPERT TESTIMONY

Chaney argues that the trial court erred when it refused to appoint experts for Chaney's defense of temporal lobe epilepsy. He argues also that the state was allowed more experts on this issue than necessary.

 Chaney, an indigent, claims that the trial court committed reversible error when it refused to appoint the two experts he wanted and grant funds for the tests he wanted. Whether an expert is to be appointed is within the discretion of the trial judge. *See* 17A A.R.S., Arizona Rules of Evidence, rule 706(a).

 In this case, Chaney's trial counsel filed a motion for appointment of expert witnesses a little more than three weeks before trial. Counsel had seen a television program dealing with temporal lobe epilepsy; he called a professor at an eastern university who concluded that "if [Chaney] doesn't have it, nobody does." The court held a hearing on the matter. Two doctors who performed the rule 11 examination testified.

The court said:

Mr. Stuhff [Chaney's trial counsel], the Court has considered the testimony that you have presented here today. We have two qualified individuals, two medical doctors who practice primarily in these fields who are familiar with temporal lobe epilepsy and who believe that he is not suffering from that, from temporal lobe epilepsy. There is no medical testimony to the contrary.

Number two, these doctors relied upon materials that you presented them and the examination of your client, as well as an interview by one of the doctors with the co-defendant. It appears to the Court that there is no hint of the disorder, except for your limited experience and your feelings in this matter and from a conversation or conversations that you have had with the doctor who has not yet examined the Defendant.

I would, therefore, reincorporate my prior findings in this matter. I don't feel that there is a reasonable basis for the medical examinations. I feel they are unnecessary.

On this record, we find the trial court did not abuse its discretion when it denied Chaney's request for funds. The doctors who examined Chaney, who were familiar with temporal lobe epilepsy, did not find the external symptoms associated with the disorder. They concluded that sophisticated tests probing the brain would, therefore, be unwarranted. It was not error to deny Chaney's request.

Although Chaney's request for funds was denied, the two experts Chaney wanted to testify did testify. Most of the tests he requested were performed. The jury listened to almost five full days of testimony concerning Chaney's mental state.

One of Chaney's experts concluded there was a 65% chance Chaney suffered from an organic brain disorder, but the doctor would not testify that at the time of the homicide Chaney was influenced by the disorder. The doctor did testify that as to the other crimes for which Chaney was charged, Chaney definitely was not influenced by any brain disorder.

Chaney's other expert concluded, based partly on his reading of an EEG, Chaney did have the organic brain disorder called temporal lobe epilepsy and that Chaney was under its influence when he committed the homicide and the aggravated assault, but none of the other crimes.

The state's experts both testified that Chaney did not have any organic brain disorder. They testified that temporal lobe epilepsy is caused by lesions in the brain. These lesions can be caused by trauma to the head. Chaney claimed his epilepsy resulted from the manner of delivery at his birth. Forceps were used and his head was discolored for some time after birth. All experts agreed that this type of trauma could cause lesions in the brain. The state's experts testified that if Chaney's claimed lesions were created by the forceps delivery, Chaney should have manifested symptoms of epilepsy throughout his life. The doctors testified that Chaney exhibited

no unusual behavior in his childhood. Also, Chaney exhibited no "depression of awareness or depression consciousness." The doctors testified that a temporal lobe seizure is significantly different from that of a classic grand mal seizure, but a basic similarity is lack of self-control.

In this case, each of Chaney's actions indicated deliberate choices. First, when he saw the patrol car, he stopped his vehicle. Second, he grabbed the most powerful weapon in his arsenal. Third, he cautioned his companion to shelter herself. Fourth, the path of the bullets indicates a desire to strike human flesh. Fifth, Chaney continued firing as he approached the patrol car and shot the victim in the back from close range (powder burns were on the victim). Sixth, when Chaney seated himself in the truck he said "murder one." Last, he told the codefendant "reload." All of this indicates keen awareness of each facet of the situation, and it is contrary to a finding of temporal lobe epilepsy.

Chaney also exhibited no amnesia, one of the symptoms of temporal lobe epilepsy. Moments after the homicide, Chaney robbed the boys and told them he had just shot a policeman. When arrested moments later, he asked how the deputy was doing. No loss of memory; no confusion of the facts; these both indicate Chaney was not suffering from temporal lobe epilepsy. Finally, Chaney offered a cognitive reason for shooting the deputy; he said, "I didn't want to go back to jail."

Deanna, the codefendant, was questioned by the state's experts. She described Chaney's outbursts of anger to the doctors, and they concluded that the outbursts did not fit the pattern of temporal lobe epilepsy.

One of the state's experts said Chaney's expert misread the EEG printout. Properly read, he testified, there was no evidence of organic brain disorder. We conclude that the trial court's decision was correct and, also, it did not prevent him from presenting what he believed to be a defense.

■ Chaney also argues that the state was allowed to present four expert witnesses on the issues of Chaney's sanity while Chaney presented only two. In his defense, Chaney called the two doctors who performed the rule 11 examinations. Counsel sought to show that these doctors did not have the expertise to diagnose temporal lobe epilepsy. During cross-examination, these two doctors were qualified as experts in the field of psychiatry. During its rebuttal case, the state called two doctors and qualified them as experts in the subject of epilepsy.

We find Chaney's argument to be without merit. The two rule 11 doctors were called by Chaney and were his witnesses. On cross-examination, the state offered the two rule 11 doctors as experts in the field psychiatry, not the subject of epilepsy. The two doctors the state called during rebuttal were the only doctors offered by the state as expert in the subject of epilepsy. *See* A.R.S. § 13–3993(A). Finally, the two rule 11 doctors examined Chaney by order of the court to determine his competence to stand trial. The two doctors called by the state in rebuttal were the only two doctors the state called who examined Chaney on behalf of the prosecution.

## PRIOR BAD ACTS

■ Chaney argues that the trial court committed reversible error when it allowed the state to introduce evidence of his prior bad acts (the burglaries and the theft of the truck). Our Rules of Evidence, rule 404(b), permit the introduction of evidence concerning a prior bad act if it is used for a valid purpose. The list of uses for this type of evidence, which is contained in rule 404(b), is not exclusive. *See State v. Jeffers*, 135 Ariz. 404, 417, 661 P.2d 1105, 1118 (1983). Evidence of prior bad acts can be introduced to complete the story of the crime. *State v. Mincey*, 130 Ariz. 389, 405, 636 P.2d 637, 653 (1981), cert. denied, 445 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d 871 (1982). The trial court's decision will not be overturned if there is no abuse of discretion. *Jeffers, supra.*

■ In this case, Chaney put a gun to the first deputy's head as soon as he was able. The jury was entitled to know under

what conditions Chaney was operating. The vehicle Chaney drove was stolen, as were most, if not all, of the items he had at the campsite. With this knowledge the events that happened become more comprehensible to the jury. We find no abuse of discretion.

## POST–VERDICT ISSUES

### A. Was Trial Counsel Ineffective?

■ After the verdict was returned, Chaney's trial counsel advised Chaney not to talk with the person who was preparing the presentence report. Chaney now claims trial counsel was ineffective, relying on *State v. Smith*, 136 Ariz. 273, 665 P.2d 995 (1983). We think Chaney's trial counsel was not ineffective and Chaney's reliance on *Smith* is misplaced.

In *Smith, id.,* we reversed because the attorney told Smith not to submit to a presentence interview because it could be used against him if a new trial were granted. That was an error in interpreting black-letter law. *Id.* at 279–80, 665 P.2d at 1001–02. In this case, counsel advised Chaney not to submit to an interview because, counsel said, no one in Flagstaff would be unbiased when Chaney's guilt was the issue. We find this decision to be strategy or tactics on which a claim of ineffectiveness of counsel is not well-founded. *See State v. Watson*, 134 Ariz. 1, 4, 653 P.2d 351, 354 (1982). Also, Chaney displays on the record what we conclude is an attempt to rely on counsel's decision, yet not be bound by it. The following transpired when the court sought to determine whether Chaney was validly waiving his right to be interviewed:

THE COURT: I think we established that you had taken some drugs within the last 24 hours, is that correct, Mr. Chaney?

THE DEFENDANT: Yes.

THE COURT: You do not feel that they would in any way affect your ability to understand what is happening here today?

THE DEFENDANT: No.

THE COURT: You understand what your client has advised the Court relative—

THE DEFENDANT: My attorney?

THE COURT: Your attorney, I'm sorry.

THE DEFENDANT: Yes.

THE COURT: —relative to the Presentence Report?

THE DEFENDANT: Yes.

THE COURT: And you are aware of the fact that he has indicated that you will not talk to Mr. Blady of the Probation Department?

THE DEFENDANT: I think that is erroneous. He has indicated that he objects.

THE COURT: Will you talk to Mr. Blady from the Probation Department?

THE DEFENDANT: I respectfully defer to my attorney.

THE COURT: Then you are concurring in this decision?

THE DEFENDANT: I didn't say that.

THE COURT: Have you been fully advised by your attorney of the situation today?

THE DEFENDANT: Yes.

THE COURT: Will you talk to Mr. Blady?

THE DEFENDANT: I respectfully defer to my attorney.

THE COURT: Mr. Stuhff, will you allow your client to speak to Mr. Blady?

MR. STUHFF: No, I will not.

THE COURT: Do you consent in that Mr. Chaney?

THE DEFENDANT: I haven't consented in that, no.

THE COURT: Well, you are either going to talk to him or not talk to him. I need to know how you are going to go about that.

THE DEFENDANT: I defer to my attorney.

THE COURT: Then the Court will consider that, for the purposes of the record, a no answer, that he will not talk to Mr. Blady without his attorney's consent.

Do you understand that you have the right to talk to Mr. Blady, if you wish to do so?

THE DEFENDANT: Yes.

THE COURT: Were any threats made or any force used to get you to not talk to Mr. Blady?

THE DEFENDANT: No.

THE COURT: You were acting entirely upon the advice of your attorney?

THE DEFENDANT: In the sense that I defer to him?

THE COURT: Yes.

THE DEFENDANT: Yes.

THE COURT: What do you mean when you say "defer" to him?

THE DEFENDANT: Allow him to make the decision for me. I neither consent nor deny Mr. Blady to be able to talk to me.

THE COURT: Do you understand that I will not send Mr. Blady to talk to you unless you will talk to him?

THE DEFENDANT: I haven't said that I wouldn't talk to him.

THE COURT: Are we playing cat-and-mouse games . . .?

Later, the court found that Chaney waived his right to submit to the presentence interview. We agree.

## B. Rule 24

■ Chaney argues that the jury considered facts not in evidence and erroneously placed the burden of proving insanity on him. Motions for new trials are disfavored and a motion for new trial "should be granted with great caution." *State v. Fisher*, 141 Ariz. 227, 251, 686 P.2d 750, 774 (1984). We will not disturb the trial court's decision if there is no abuse of discretion. *Id.*

■ Chaney argues that two of the jurors passed on to the other jurors rumors concerning one of his witnesses. The witness, who was Chaney's investigator, was allegedly considered, because of these rumors, to be "a shady character" and his testimony was supposedly not used by the jury in arriving at its verdict. If the jurors considered these rumors in evaluating the witness's testimony, it would constitute misconduct. *See* rule 24.1(c)(3)(i); *State v. Poland*, 132 Ariz. 269, 281–85, 645 P.2d 784, 796–800 (1982). For purposes of our discussion, we will assume each juror committed this misconduct. A new trial is required if the court cannot find beyond a reasonable doubt that the extrinsic evidence did not contribute to the verdict. *Id.* at 283, 645 P.2d at 798.

■ The trial court reviewed the investigator's testimony and found that if the jury did consider the rumors and decided therefore not to use the investigator's testimony, the verdict, beyond a reasonable doubt, would not have been different. We have reviewed the investigator's testimony also. It consumes approximately 40 pages of this 18-day trial. The investigator testified that when he visited Chaney in jail on one occasion, Chaney almost attacked him. This was to substantiate Chaney's defense of insanity. We find that the trial court did not abuse its discretion, and we agree with its conclusion.

Chaney next argues that in trial counsel's conversation with a juror after trial, trial counsel discovered that the jury had placed on Chaney the burden of proving insanity rather than requiring the state to prove Chaney was sane beyond a reasonable doubt. At the time of trial, the state was so required. *See* former A.R.S. § 13–502; *State v. Coconino County Superior Court*, 139 Ariz. 422, 678 P.2d 1386 (1984).

■ Rule 24.1(c)(3) contains the list of the types of misconduct upon which a motion for new trial may be based. *Poland, supra*, 132 Ariz. at 282, 645 P.2d at 797. The list is exclusive. *State v. Hall*, 129 Ariz. 589, 595, 633 P.2d 398, 404 (1981). Whether the jury used the wrong burden of proof is not misconduct upon which a motion for new trial may be based. *See id.* (Affidavit presented which indicated juror not sure defendant was guilty beyond a reasonable doubt). Therefore, the trial court's denial of Chaney's motion for new trial was not error.

We note that the juror who talked with Chaney's counsel was placed under oath by the trial judge and asked if she had followed the court's instruction. She said she had. We can find no basis for concluding the jurors committed misconduct.

## DEATH PENALTY

Chaney argues that Arizona's death penalty is unconstitutional, there were no aggravating circumstances in this case, and the trial court failed to consider all mitigating circumstances. We have considered the constitutionality of the death penalty statute, A.R.S. § 13–703, on many occasions, and have found it to be constitutional. *See, e.g., State v. Jordan,* 137 Ariz. 504, 672 P.2d 169 (1983).

 The trial court found one aggravating circumstance: heinous, cruel or depraved. *See* A.R.S. § 13–703(F)(6). Chaney argues that this murder was not heinous, cruel or depraved. As this court recently said in *State v. James,* 141 Ariz. 141, 146–147, 685 P.2d 1293, 1298–1299 (1984) the three key words of subsection (F)(6) are in the disjunctive and any one of them would constitute an aggravating circumstance. Physical pain or mental distress suffered by the victim can support a finding of cruelty. *Id. See State v. Adamson,* 136 Ariz. 250, 266, 665 P.2d 972, 988 (1983) (cruelty must be foreseeable by defendant). Heinous and depraved concern the mental state and attitude of the perpetrator. *Id.* We have an independent duty to review the evidence to determine whether the sentence of death is properly imposed. *McMurtrey, supra,* 136 Ariz. at 101, 664 P.2d at 645.

 The murder was cruel. We know the victim suffered mental anguish. As the high-powered rifle was fired, bullets began bursting through the windshield, sending flying glass and metal throughout the vehicle, with approximately two hundred such objects striking with enough velocity that they ripped through the victim's clothes and struck his body. The victim knew his weapons were of no use to him. The shotgun with which his vehicle was equipped had a safety lock on the mechanism that held it in place. To release the safety, one must sit behind the steering wheel and reach with the left hand to the left of the steering wheel and pull a lever while simultaneously pulling the shotgun, which is located in the middle of the front seat. There is a cluster of bullet holes in the windshield which correspond to where the deputy would have been required to be to perform this maneuver. The deputy carried his side arm on his right side. This is the side he fell to in his attempt to shield himself. We also know he suffered because he said into his microphone, "goddamn someone please help." He was shot several times. At least one shot from behind was from such short range that powder burns were left on his body. After the attack, the victim, who was a doctor, was conscious for approximately 30 minutes. He was slowly bleeding to death, and he knew it. He told the medics, "I'm dying, I'm dying." His left arm was almost severed by a bullet, it hung to the body by a muscle; the victim looked at what remained of his arm. Before help arrived, he could hear the radio transmissions and the fact that no one was sure where he was for several minutes. It is not necessary to speculate about the victim's mental anguish; he helplessly and uselessly begged and waited for help.

Chaney knew of what the AR–15 was capable; he explained its use and power to Deanna. Chaney stood close enough to the victim to see that the victim was in great pain; Chaney then fired again. When Chaney left he knew the victim was not dead and Chaney knew the victim was suffering. The murder was cruel.

 The murder was especially heinous and depraved. Chaney exhibited a complete disregard for the victim's life. Once the victim was down, he was helpless. Chaney stood close enough to see this. He could have made his escape but he decided to shoot again. Shooting a helpless victim from the rear from close range is evidence

of this aggravating circumstance. Once the victim was down, Chaney could have taken the victim's guns and disabled the two-way radio as he had just done with the other deputy. Thus, the crime was senseless. *James, supra.* Also, intentionally and repeatedly firing a high-powered, destructive weapon at the victim tends to show the crime was heinous and depraved.

■ Chaney argues that the trial court did not consider all of the possible mitigating circumstances. We disagree.

The trial court considered each mitigating circumstance enumerated in the statute, *see* A.R.S. § 13–703(G)(1)–(5), and specifically found that none were present. Also, the court said that it "considered all of the testimony and evidence received with regard to all aspects of the defendant's character, propensities, and the defendant's record and the circumstances of the offense" and concluded that there were no mitigating circumstances sufficient to call for leniency.

To support his claim, Chaney states that the judge wrongfully concluded that Chaney's mental state did not constitute a mitigating circumstance and that other factors should have been considered in conjunction with his mental state; for example, Chaney's family background, the other victims were not harmed, and Deanna received a lesser sentence.

As noted above, the trial judge specifically found that Chaney's mental state was not a mitigating circumstance sufficiently substantial to call for leniency. From the record, it does not appear that the trial court considered Chaney's family background or Deanna's sentences as mitigating evidence. Also, although the trial judge said he considered all aspects of the case, he did not mention specifically that he considered the fact that the other victims were not shot as a mitigating circumstance.

Chaney's family background is not mitigating. He has spent much of his life from his late teens in and out of jail and he did not have considerable contact with his family. Also, when he "married" Deanna, he was married to another. He often choked and struck Deanna and asked her if she liked it. When she replied that she did not, he would attack her again and ask why she forced him to hit her.

Deanna's sentence is not mitigating. She pleaded guilty to second degree murder and other charges. She received 21 years imprisonment on the murder charge with the other sentences to run concurrently. She was not a minor participant and has earned her punishment, but she did not initiate any of the violence nor did she direct violence toward anyone. Her role was limited to carrying out Chaney's orders; for example, taking the first deputy's gun and pulling out the microphone of his vehicle's two-way radio, handing Chaney the AR–15 during the encounter with the first deputy, and engaging the boys, whose truck Chaney wanted, in conversation so Chaney could catch them unaware. Moreover, her cooperation with the prosecution not only helped establish the case against Chaney, but her interviews with the doctors before trial and her testimony at trial tended to refute Chaney's claim of insanity. Finally, on the stand she said she did not understand how she became involved in this entire tragic event and that it would probably take a lifetime, if ever, to understand how she became involved. She is another of Chaney's victims.

Chaney's claim that not harming the other victims constitutes a mitigating circumstance is, in this case, without merit. Each of the other victims was sure Chaney was about to kill. One victim testified that he waited, as Chaney stood behind him, to hear the report of the rifle and feel the bullet tear into his flesh. Terrorizing victims cannot be considered a mitigating circumstance.

■ We have independently reviewed the record and we conclude that the evidence in mitigation is minor at best and not

sufficiently substantial to call for leniency. We have conducted a proportionality review, pursuant to *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977), and find the sentence in this case to be proportional to the penalties in other cases, *see, e.g., State v. Adamson,* 136 Ariz. 250, 665 P.2d 972 (1983); *State v. Ceja,* 126 Ariz. 35, 612 P.2d 491 (1980). This case is dissimilar to *State v. Brookover,* 124 Ariz. 38, 601 P.2d 1322 (1979).

We have reviewed the record for fundamental error and have found none. *See* A.R.S. § 13–4035. The convictions and sentences are affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON and FELDMAN, JJ., concur.